Lawrence E. MOCH, et al.

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD, et al.**

**UNITED STATES of America**

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD, et al.**

Civ. A. Nos. 74–280–B, 76–252–B.

United States District Court, M. D. Louisiana.

June 6, 1980.

Walter Dumas, Baton Rouge, La., for Moch, et al.

J. Gerald Hebert, U. S. Dept. of Justice, Washington, D. C., for U.S.A.

John F. Ward, Jr., Baton Rouge, La., for E.B.R. Parish School Bd.

## MEMORANDUM OPINION

JOHN V. PARKER, Chief Judge.

This matter is before the Court for approval or rejection of a proposed consent decree which has been presented by the parties. The consent decree is presented as a permanent conclusion to this recently consolidated litigation which has been pending since 1974 and 1976, respectively. No oral argument is required.

The East Baton Rouge Parish School Board, under State law, is composed of twelve members elected at large from each of the three wards in the parish. Seven are elected from Ward 1 (which is the City of Baton Rouge), three are elected from Ward 2, and two are elected from Ward 3. All members run at large within their respec-

tive wards and each serves six-year, staggered terms so that every two years four members of the board come up for election. Four members will be up for election in September of 1980.

By Act 122 of 1977 (LSA–R.S. 17:58, 58.1, 58.2 and 58.3) the Louisiana Legislature mandated single-member districts for the East Baton Rouge Parish School Board commencing in 1982 under a plan to be devised by the board using 1980 census data. Obviously, these suits antedate the State legislation mandating single-member districts.

On October 10, 1974, plaintiffs, Lawrence E. Moch, et al., filed suit alleging that the multi-member ward system of electing school board members violates the Fourteenth and Fifteenth Amendments to the United States Constitution by diluting the votes of black voters in the parish, depriving black citizens of the opportunity to elect black people to the board. The district court sustained a plea of res judicata on the basis of older litigation and dismissed the action. Plaintiffs appealed to the United States Court of Appeals for the Fifth Circuit, which held that there had been a change in the law regarding the constitutionality of multi-member districts after conclusion of the earlier litigation, and it reversed the district court, remanding the matter for further proceedings. See *Moch v. East Baton Rouge Parish School Board*, 548 F.2d 594 (5th Cir. 1977). That suit is pending on the docket of this Court.

On August 17, 1976, the United States of America filed suit independently of plaintiffs in the other litigation, under the authority of 42 U.S.C. § 1971(a), § 1971(c), § 1973j(d), and 28 U.S.C. § 2201, alleging that the multi-member system of electing school board members violates Section 2 of the Voting Rights Act of 1964, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments. The district court sustained a motion to dismiss filed on behalf of the school board and the United States appealed. The Court of Appeals reversed and remanded for further proceedings. See

*United States v. East Baton Rouge Parish School Board*, 594 F.2d 56 (5th Cir. 1979). Subsequent to remand, the United States has pressed the litigation and it is presently assigned for trial on the merits.

In the course of trial preparation and probably as a result of the decision of the Supreme Court in *City of Mobile, Alabama, v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the attorneys for the government broached the question of possible settlement with attorneys for the school board. To the knowledge of this Court, although without participation by the Court, negotiations have been underway for at least a month relative to possible amicable disposition of the litigation. Attorneys for the plaintiff in Civil Action No. 74–280–B apparently learned of these negotiations and requested participation therein. They also presented a motion to consolidate these two actions, which the Court granted on May 20, 1980. The parties have, as noted above, come to an accommodation among themselves and have jointly filed a proposed consent decree moving the Court for its approval. The consent decree is set forth in the appendix but it basically provides:

(1) The school board, while consenting to the decree, denies that the multi-member ward system of elections violates either Section 2 of the Voting Rights Act of 1965 or the Fourteenth and Fifteenth Amendments to the Constitution;

(2) All parties prefer compromise to continuing litigation;

(3) The school board shall develop a plan of single-member districts within sixty days and submit it to the Attorney General for pre-clearance under Section 5 of the Voting Rights Act;

(4) The terms of four of the twelve board members expire and elections shall be held in September 1980 in four single-member districts to be drawn in which these four board members reside;

(5) Three additional members shall be added to the school board (making a total of fifteen), and elections shall be held in September 1980 in these three single-member districts to be drawn in areas where black citizens compromise a substantial majority of the population. The terms of office of these three members shall expire on December 31, 1982, and the board shall revert to a twelve-member board.

(6) The school board is to be permanently enjoined from continuing elections pursuant to the multi-member ward system;

(7) Within ninety days of receipt of the 1980 official federal census data, the school board shall develop a single-member district plan for all twelve members; this plan shall also be submitted to the Attorney General for pre-clearance;

(8) The 1982 elections for all twelve members will be from single-member districts for terms of two, four or six years, drawn by lot, thus eventually phasing in a twelve-member board serving six year staggered terms.

█ It is axiomatic that the law favors compromise over litigation, and this is no less true in cases involving discrimination claims and governmental agencies. *United States v. City of Jackson, Mississippi*, 519 F.2d 1147 (5th Cir. 1975).

█ It is also clear that in apportionment cases, whether the claims involve minority vote dilution or one man-one vote claims, the preferred course is to afford a reasonable opportunity for the legislative body involved to put forth a plan before a federal district court attempts to impose a plan. *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).

Of course, here there has not yet been a trial upon the merits and the Court has not held that the existing plan (or that contemplated by Act 122 of 1977) infringes upon the Constitution or is otherwise invalid. The Court expresses no opinion concerning the merits of either suit. Nevertheless, the judicial non-intervention principle enunciat-

ed in *Wise v. Lipscomb* does have application here. It is better that the school board devise its own plan than for this Court to do so.

In *United States v. City of Jackson, Mississippi, supra,* the Court of Appeals discussed the significant differences between consent decrees and litigated judgments, pointing out that while a Court must approve a consent decree, it does not inquire into the precise legal rights of the parties but only assures itself that there has been valid consent and that the terms are not unlawful, unreasonable or inequitable. The Court also noted that it is a useful tool for federal governmental agencies who are charged with enforcing particularly the civil rights laws enacted by the Congress, since the government itself may avoid the risks as well as costs of full-scale litigation (519 F.2d at 1151).

In two recent cases the Fifth Circuit has elaborated further upon the use of consent decrees in civil rights actions. In *United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir. 1980), the Court considered a proposed consent decree in an employment discrimination action brought by the United States against almost all of the municipalities in Louisiana. The district court refused to approve the consent decree and the Court of Appeals reversed, ordering the district court to enter the decree. The Court of Appeals reviewed the proposed decree under the standard of unreasonable, illegal, unconstitutional or against public policy and, finding none of these, reversed and remanded. In *United States v. City of Miami, Florida,* 614 F.2d 1322 (5th Cir. 1980), decided the same day involving a similar suit against the City of Miami and other Florida municipalities, the district court did approve the consent decree over opposition. The Court noted:

"The trial court may only rely on whatever record he has before him when the settlement is proposed; if nothing appears to make him believe the settlement is unreasonable, illegal, unconstitutional or against public policy, he should grant his approval." (614 F.2d at 1334)

Thus, this Court must review the proposed consent decree under the standard enunciated by the Court of Appeals in *United States v. City of Miami, Florida* and *United States v. City of Alexandria.*[1]

The initial problem encountered in this consent decree is that there is no finding that the present election system is unconstitutional or in violation of law. Indeed, the defendant staunchly denies any such violation. The question thus arises as to whether the Court should permit the parties to the litigation to hammer out a compromise election system which does not accord with present Louisiana law in the absence of a finding that the system is invalid. After all, thousands of persons residing in East Baton Rouge Parish will be affected by the consent decree, if approved, and they are not parties and have had no voice in the confection of the compromise.[2]

In *United States v. City of Alexandria, supra,* the defendant municipalities declined to admit any wrongdoing, and this was a significant factor in the refusal of the trial judge to approve the decree. The Fifth Circuit noted the disclaimer by the defendants, but, for some reason not appearing in the report of the decision, assumed that the defendants did not "seriously dispute the facts." The Court of Appeals proceeded to summarize the allegations of the complaint and concluded that if the case had actually been tried, the defendants would probably

1. Both the *Miami* and *Alexandria* cases were Title VII actions alleging discriminatory hiring practices in municipal, fire and police departments. While the cases did not involve reapportionment claims, I conclude that the reasoning of these cases must also apply to cases alleging black voter dilution.

2. The Court understands that the school board held a mammoth public hearing on this matter

at which many citizens were heard and that the parties actually conducted public negotiations at that meeting. While this approach certainly has a laudable purpose and is wise or unwise, depending on one's status as negotiator or onlooker, it reached only a fraction of the citizens of the community and can in no way be accepted as an adequate representation of all the citizens of the parish.

have lost. The Court inferred that this was ample justification for approval of the consent decree.

I have made no such review of the allegations of these complaints, and, as noted above, I specifically decline to express any opinion regarding the merits of the claim. It is well known that in litigation between private parties, defendants who enter compromise settlements carefully refrain from admitting liability and courts routinely approve such settlements. I read *United States v. City of Alexandria* and *United States v. City of Miami, Florida* as holding that a district court is mandated to approve a consent decree in civil rights cases even where the defendant public body does not admit wrongdoing. Public bodies may want to, and ought to be permitted to, protect themselves from claims for damages or attorney's fees or other claims which might follow admission of constitutional or other violations in consent decrees. After all, if there has been no trial upon the merits, why should there be such an admission? If public bodies must admit guilt in order to settle these cases, then settlements are going to be few and far between.

■■ Thus, I conclude that this proposal does not require an admission by the school board that the present system is unconstitutional or otherwise invalid. In that connection, although not expressing any view upon the merits, but considering the jurisprudence of the last fifteen years, it is certainly prudent for the school board to view these suits as serious claims. Moreover, they are expensive; each has been pending for a number of years; each has been separately litigated in the district court, appealed to the Court of Appeals and remanded to the district court.

Compromise of extended and expensive litigation was reasonable for all parties in both of these actions.

■ The proposal does not appear to be unconstitutional or unlawful; on the contrary, it contains a plan which is certain to result in black persons being elected to the board and it will, when in full operation,

comply fully with one man-one vote criteria as well. The consent decree proposes an election system which in 1982 will almost track the requirements of the Louisiana Legislature set forth in the 1977 statute and that is desirable. Whenever possible, the State should be free to devise its own apportionment plans. *Wise v. Lipscomb, supra.*

■■ The federal constitution does not require the states to provide an electoral system that will ensure that black voters may elect black candidates to public office (at least where no discriminatory governmental motive is established), *City of Mobile v. Bolden, supra.* On the other hand, the Constitution does not prohibit the states from devising a system that will probably result in black voters having that opportunity. Here, in the face of litigation alleging racially discriminatory motives and demanding immediate and total dismantling of the present system, the school board has chosen to follow a course that attempts to fence black voters *in*, rather than *out* of, the electoral process. Cf. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). This Court finds no constitutional impediment to that experiment.

Obviously, I have received no evidence upon the issue, but my review discloses nothing unconstitutional or unlawful about the proposal and the consent decree, as presented, carries with it a presumption of validity. (*United States v. City of Miami, Florida*, 614 F.2d at 1333)

It is apparent that in the 1980 elections there will be four single-member districts drawn for the four incumbent members whose term expire. The residents of these four districts, as well as the residents of the three new districts to be created, arguably will have more representation during the interval before the 1982 elections than other residents of the parish. It can be argued that other areas will be under-represented: they do not have single-member districts since the remaining eight members of the board were elected at large and will continue in office for the next two years. The

argument can be made that the proposed plan is thus unfair to the remainder of the parish. It can also be argued that the school board should not be permitted to draw single-member districts which will obviate the necessity for the four incumbents to run for re-election against each other and the consent decree does indicate such an intention.

The only alternatives which occur to me in lieu of these four single-member districts would be to permit these four to run at large in 1980, to which the Attorney General vigorously objects, or to perpetuate them in office until 1982 without an election, to which this Court would take strong exception. Even an imperfect election is better than no election at all.

The Louisiana Legislature has mandated single-member district beginning in 1982, using 1980 census data. The U. S. Attorney General has demanded single-member districts for all members of the board immediately. The drawing of four single-member districts for the 1982 election, together with creation of three new districts, while retaining the other eight members until 1982, seems entirely fair and reasonable. Complete reapportionment at this time would be expensive and short-lived because it would have to be done over again after the 1980 census. One has to start somewhere and to this Court, the compromise worked out by these parties seems fair and reasonable to the parties as well as to the entire parish.

The Attorney General is charged by the Congress with enforcement of the Voting Rights Act of 1965. He has participated in the negotiation of this settlement, has approved it and recommends it. In *United States v. City of Miami, Florida, supra,* the Court of Appeals considered such approval by the agency charged with enforcing the law as a significant factor in favor of court approval of consent decrees. While this Court views the Attorney General in this matter as another party litigant and is not willing to blindly follow his lead, it recognizes that the objectives of the Attorney General here are probably broader than those of any other party and that the litiga-

tion has been time-consuming and expensive for the government as well.

Finally, the consent decree furthers public policy because it meets the requirements of federal law and when fully implemented in two years will meet the requirements of Louisiana Act 122 of 1977 at exactly the same time (1982) and in exactly the same manner (twelve single-member districts) as prescribed by that statute.

The compromise is exactly that. No party gets all that he demanded or desired. The plan modifies Louisiana law in two respects: by adding three members to serve for a two-year period and by beginning single-member districts in 1980 instead of 1982. It fully complies with federal law and beginning in 1982, with state law, and in the interim eliminates the necessity for trial and possible appeal of these two long-pending actions.

No opposition has been filed and finding no reason for disapproval of the proposed consent decree and applying the presumption of validity mandated by *United States v. City of Miami*, the Court will approve it.