William RAFFERTY; Sharman Simon; Robert Kuti; Daniel Mikus; David Bernat; Cynthia Dellick, Plaintiffs–Appellants,

v.

CITY OF YOUNGSTOWN, et al., Defendants–Appellees.

No. 93–4193.

United States Court of Appeals, Sixth Circuit.

Submitted Jan. 27, 1995.

Decided May 23, 1995.

Timothy P. Maloney (briefed), Huberman & Gentile, Youngstown, OH, for plaintiffs-appellants William Rafferty, Sharman Simon, Robert Kuti, Daniel Mikus, David Bernat, Cynthia Ann Dellick.

Cheryl L. Waite (briefed), Edwin Romero (briefed), Youngstown, OH, City of Youngstown, et al., for defendants-appellees.

Before: CONTIE, RYAN, and SILER, Circuit Judges.

CONTIE, Circuit Judge.

Plaintiffs-appellants, William Rafferty, Sharman Simon, Robert Kuti, Daniel Mikus, David Bernat, and Cynthia Dellick, appeal the district court's decision that they lacked standing to sue defendants-appellees, the City of Youngstown, et al. ("the City"), in this civil rights action, alleging unlawful racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–

5(f)(B) and violations of 42 U.S.C. §§ 1983 and 1988 because their rights under the due process clause and equal protection clause of the Fourteenth Amendment were denied. For the following reasons, we affirm the decision of the district court that plaintiffs do not have standing to sue.

### I.

On June 27, 1989, the plaintiffs herein, six white police officers in the City of Youngstown Police Department, filed this action alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1983 and 1988. Plaintiffs contended that a stipulated settlement agreement pursuant to a 1986 Consent Decree in the case of *Williams v. Vukovich*, No. C76-6Y (N.D. Ohio) ("the *Williams* case") would result in the promotion of six unqualified minority police officers to the rank of detective-sergeant, would deny plaintiffs promotion to this rank, and would discriminate against them on the basis of race because they were qualified for these promotions. Plaintiffs sought a temporary restraining order against defendants from "certifying, appointing, or promoting" to the rank of detective-sergeant any Youngstown police officers who had not received a score of 70% or above on a May 28, 1987 qualifying exam. In addition, plaintiffs sought a declaratory judgment that the police department's promotion of minority officers, who had not received a score of 70% or above, violated plaintiffs' Fourteenth Amendment rights. Finally plaintiffs sought a preliminary and permanent injunction against the City against engaging in racially discriminatory promotional practices and an order requiring an award of damages, costs and fees.

The district court denied plaintiffs' motion for a temporary restraining order on July 13, 1989, and plaintiffs appealed. The Court of Appeals for the Sixth Circuit dismissed the appeal, stating that the denial was not immediately appealable. On February 19, 1993, plaintiffs filed motions for a preliminary injunction and for summary judgment. On June 18, 1993, defendants filed a motion for summary judgment. The preliminary injunction issue came up for a hearing on June 24, 1993 at which time the district court allowed counsel to address the motions pending, and the court took the matter under advisement. With respect to the summary judgment motions, the court held a telephonic conference on July 1, 1993, whereby the parties agreed to file a list of issues, a stipulation of facts, and exhibits for trial.

On September 30, 1993, the district court granted defendants' motion for summary judgment on the basis that plaintiffs lacked standing to challenge the 1989 stipulated settlement agreement and 1986 Consent Decree entered into in the *Williams* case. Plaintiffs timely filed this appeal.

### II.

■ Plaintiffs contend that the district court erred in granting defendants' motion for summary judgment on the ground that plaintiffs lacked standing to sue. In reviewing the district court's ruling on a motion for summary judgment, this court's role is identical to that of the district court. *Electro-Mechanical Corp. v. Ogan,* 9 F.3d 445 (6th Cir.1993); *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304 (6th Cir.1989); *Hand v. Central Transport, Inc.,* 779 F.2d 8 (6th Cir.1985). Fed.R.Civ.P. 56(c) provides that summary judgment should be granted when there is no genuine issue as to any material fact.

■ The issue which must be addressed on appeal is whether the district court erred in granting summary judgment because plaintiffs lacked standing to sue the City of Youngstown for racial discrimination for actions taken pursuant to a 1986 Consent Decree. In order to address this issue, it is necessary to understand the history of the 1986 Consent Decree which plaintiffs allege violate their Title VII and constitutional rights.

On January 7, 1976, numerous black officers of the Youngstown Police Department instituted a class action suit against the City, alleging racially discriminatory practices in hiring and promoting black applicants and employees of the Youngstown Police Department, contrary to the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, 1985 and

1986. *Williams v. Vukovich,* No. C76–6Y (N.D. Ohio).

On December 5, 1979, the Youngstown Fraternal Order of Police ("FOP"), Lodge No. 28, was granted leave to intervene as a party-defendant in the *Williams* case. In its motion for intervention, the FOP claimed an interest in the litigation by virtue of its status as the collective bargaining representative for all police officers employed by the City of Youngstown. On January 17, 1986, the FOP objected to the terms of the proposed Consent Decree and was not a signatory to the decree.[1] The Consent Decree at issue in the present case was issued on January 21, 1986. The FOP filed an appeal with the Sixth Circuit in the *Williams* case on February 18, 1986, contesting the legality of the Consent Decree. However, the FOP voluntarily dismissed its appeal on September 25, 1986. After dismissing its appeal, the FOP was actively involved in the *Williams* litigation, attending pre-trial conferences and participating in the settlement negotiations entered into in resolving the *Williams* litigation.

The 1986 Consent Decree required the City to perform specific acts on or before specific dates in order to correct the racially discriminatory practices in the Youngstown Police Department, including the following:

(a) The development and adoption of validated examinations for hiring in accordance with EEOC guidelines.

(b) The scheduling of promotional examinations for each rank above the rank of patrolman.

(c) The promulgation of an eligibility list for promotion to each position above the rank of patrolman.

(d) The preparation and certification of a majority and a minority promotional list based upon validated examinations.

(e) The promotion of twelve persons to the rank of detective-sergeant; six white and six black on or before July 7, 1986.

The validated promotional examination for the rank of detective-sergeant was not administered until May 28, 1987. Based on the examination results, the City promoted to the rank of detective-sergeant the top four white police officers from the majority list and the top four black officers from the minority list, all of whom had received a score of 70% or better on the qualifying exam. The City determined that only four minority candidates had achieved "passing" scores, which had always been 70% or above. On July 24, 1987, fifteen vacancies existed for the position of detective-sergeant within the Youngstown Police Department. Therefore, after these eight promotions had been made (four white policemen and four black policemen), seven vacancies for the rank of detective-sergeant were left open. The parties to the Consent Decree negotiated about how to fulfill the term that required that six minority policemen be promoted when only four minority policemen had received a score of 70% or above.

On September 4, 1987, two of the plaintiffs in the present case (who were then ranked 20th and 25th from the top on the majority promotional list) filed a motion to intervene in the *Williams* case (Sharman Simon and Cynthia Dellick). Numbers 5 and 6 on the majority list (Riley and Fergus) moved to intervene on October 15, 1987. Numbers 7, 8, and 9 (McKnight, Martin and DeMatteo) filed a motion to intervene on November 2, 1987. Number 10 (Holzschuh) moved to intervene on September 28, 1988.

Simon and Dellick's motion was denied by the district court on May 17, 1988. The May 17, 1988 Order, however, allowed the limited intervention of majority list numbers 7, 8 and 9, for purposes of entering into negotiations with the City. On September 19, 1988, the City promoted two white officers, Riley and Fergus, (numbers five and six on the majority list). There were no corresponding promotions from the minority list.

Between September 28, 1988 and May 8, 1989, several of the intervenors filed motions

---

1. The FOP had signed a prior consent decree, which was rejected by this court in *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983) as illegal and contrary to public interest in part because the decree placed undue reliance on promotion examinations, which had a demonstrably adverse impact on minorities.

of contempt in the *Williams* case, contesting the manner in which the 1986 Consent Decree was being implemented by the City, including a motion by the FOP.

On June 12, 1989, the parties to the *Williams* case reached a stipulated settlement agreement concerning the resolution of the pending motions. The Fraternal Order of Police, as a defendant-intervenor in *Williams,* was represented at the settlement conferences.

By the time the settlement agreement in the *Williams* case was reached, there were thirteen vacancies for the rank of detective-sergeant that needed to be filled. Under the terms of the settlement, eleven white policemen were to be promoted and two minority policemen were to be promoted to these vacancies. In addition, four more minority policemen were to be promoted to new positions at the rank of detective-sergeant, positions which were created by an emergency ordinance, No. 89–325, enacted by the City on June 15, 1989.

In reaching the settlement agreement concerning the resolution of pending motions in the *Williams* case, the parties determined that all the officers to be promoted had met all requirements for appointment to the rank of detective-sergeant. The City stated that through further analysis of the test scores achieved on the May 28, 1987 qualifying examination, the City had determined, based on consultation with testing professionals, that all the candidates who were to be promoted had attained the minimum grades necessary for promotion. The FOP, which participated in the negotiations, as well as all the parties in the *Williams* case, eventually withdrew their objections to the stipulated settlement. The FOP, thus, acquiesced in the stipulated settlement providing for the promotion of six minority policemen and eleven majority policemen.

In a hearing before the district court on June 29, 1989, to address plaintiffs' motion for an emergency temporary restraining order, the district court stated the following:

Here we have [this] situation. We have had an intervention by the Fraternal Order of Police, and that group of individuals who now raise the objection in the *Rafferty* action were in fact a part of the [prior *Williams* ] lawsuit, and were involved in the lawsuit, were a party to the lawsuit when the Consent Decree in 1985 went on, and they in fact did appeal it. But, it was the same intervenor group of which the plaintiffs belong that dismissed voluntarily an appeal. And so it isn't as if action is being taken by ... a group of individuals that [were] not an integral part of ... at all critical times involved in [the *Williams* ] litigation, a part of this litigation....

Appendix, p. 322.

The City of Youngstown argued to the district court that plaintiffs in the present case were impermissibly trying to collaterally attack and set aside the *Williams* Consent Decree, which their collective bargaining representative, the FOP, as defendant-intervenor in the *Williams* case, had decided not to appeal. The City argued plaintiffs also lacked standing to challenge the stipulated settlement, which was entered into in June 1989 with the approval of the FOP, their collective bargaining representative.

Plaintiffs argued that they were not represented in the Consent Decree negotiations in the *Williams* case because their collective bargaining representative is FOP, Lodge No. 28, Labor Council, which is not the same entity that was granted leave to intervene in the *Williams* case—FOP, Lodge No. 28. Plaintiffs relied on *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), in which the Supreme Court held that white firefighters in the city of Birmingham were not precluded from arguing that the employment decisions taken pursuant to a Consent Decree between black firefighters and the City constituted racial discrimination in violation of Title VII. The Supreme Court based its reasoning on the fact that the white firefighters had not been a party to the litigation involving the Consent Decree and could not be deemed to be making a collateral attack on a prior judgment by which they were bound.[2]

**2.** It should be noted that portions of the Supreme Court's decision in *Martin v. Wilks* have been superseded by statute—Section 108 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(n)(1),

The City of Youngstown argued that *Martin* is distinguishable from the present case. In *Martin*, the white firefighters and their union were denied leave to intervene; in contrast, in the present case, plaintiffs' collective bargaining representative, the FOP, was granted leave to intervene as a defendant-intervenor in the *Williams* case, which resulted in the 1986 Consent Decree and the June 1989 settlement agreement, which plaintiffs are challenging.

We agree with the City of Youngstown that plaintiffs' reliance on *Martin v. Wilks* is to no avail. The Supreme Court's holding in *Martin v. Wilks* was premised on the fact that the white firefighters and their union were denied leave to intervene in the underlying litigation that led to the consent decree. Plaintiffs in the present case are distinguishable from the white firefighters in *Martin* because plaintiffs' collective bargaining representative, the FOP, was a defendant-intervenor in the *Williams* case and was granted the rights of a normal party litigant therein. The Supreme Court recognized that its holding in *Martin* that non-parties to a consent decree could challenge its allegedly discriminatory impact would not apply to persons who, even though they were not parties themselves, were "represented by someone with the same interests, who is a party." 490 U.S. at 762 n. 2, 109 S.Ct. at 2184 n. 2. The Supreme Court's decision in *Martin v. Wilks* thus applies only when the non-party's interests have not been adequately represented by an existing party. *United States v. Yonkers Board of Education*, 902 F.2d 213, 218 (2nd Cir.1990).

In the present case, it is clear that in light of the FOP's conduct in the *Williams* litigation and its relationship with plaintiffs throughout that process, plaintiffs fall squarely within the "adequate representation" exception of *Martin*, precluding further attack on the legality of the 1986 Consent Decree. First, the facts of the present case are clearly distinguishable from *Martin*. The Court in *Martin* permitted white firefighters to collaterally attack the consent decree on the ground that neither the white firefighters *nor their union* had been permitted to intervene in the litigation. 490 U.S. at 758–60, 109 S.Ct. at 2183. In the present case, however, the district court granted plaintiffs' union, the FOP's, motion to intervene as a party defendant in *Williams v. Vukovich*. The FOP union fully participated as a party in the *Williams* litigation by filing its answer in intervention in that litigation and by appealing the district court's decision in *Williams v. Vukovich* to the Sixth Circuit. The record is clear that the FOP vigorously litigated the issue of the effect mandatory promotions of minority policemen would have on majority police officers. Plaintiffs do not deny this, and the FOP union's subsequent refusal to sign the 1986 Consent Decree is further evidence of its identity of position and interests with the present plaintiffs in the negotiations that led to the 1986 Consent Decree. The FOP, as defendant-intervenor, was afforded the right to appeal the terms of the 1986 Consent Decree entered into between the black officers of the Youngstown Police Department and the City of Youngstown in *Williams v. Vukovich*, but after filing an appeal with the Sixth Circuit, dismissed it and decided not to exercise this right. Therefore, the FOP and its members are bound by principles of res judicata by the final judgment in the *Williams* case in regard to the 1986 Consent Decree.

In regard to the stipulated settlement of June 1989 resolving the litigation in the *Williams* case, the district court stated in its order of September 30, 1993, the following:

Plaintiffs submitted an affidavit of William Blanchard, Chairman for the Youngstown FOP Lodge No. 28 Labor Council from 1988 through 1989. In his affidavit, Mr. Blanchard admits that although not a signatory of the consent decree, he did attend numerous meetings between the City and other parties and was allowed to observe and offer input. Furthermore, Mr. Blanchard indicated that he was permitted to participate in the June 12, 1989 proceeding before this Court which resulted in the settlement of *Williams*. Despite the fact

which became effective on November 21, 1991. However, we agree with the court in *Maitland v. University of Minnesota*, 43 F.3d 357 (8th Cir. 1994) that section 108 is not to be applied retroactively, and, therefore, we do not consider it in regard to the present case.

that the [FOP] council mandated that he resist any promotions of officers who did not pass the promotional exam, in light of the circumstances during that proceeding, Mr. Blanchard did not resist the promotions of the minority officers who did not pass the exam.

Appendix, p. 312. The district court, thus, made a factual determination that the FOP adequately participated in the proceedings leading to the stipulated settlement agreement and after participating in the meeting in June 1989, the FOP decided based on the circumstances of the meeting to no longer object to the promotion of the six minority officers who had not received a score of 70% or above.

The record supports the district court's determination that plaintiffs' bargaining representative, the FOP, actively participated in the negotiations leading to the stipulated settlement of June 1989, which it approved. On June 12, 1989, when the parties to the Consent Decree entered into a stipulated settlement of outstanding issues, including the promotion of six minority officers who had not received a score of 70% or higher on the May 28, 1987 exam, William Blanchard, Chairman of the FOP, Lodge No. 28, Labor Council, was present and acquiesced and approved of the stipulated settlement. In his affidavit, Blanchard stated that he was representing the bargaining unit, that he attended not only the settlement meeting of June 12, 1989, but also several other meetings, and that he participated in and agreed to the stipulated agreement that resulted in the promotions of the six minority policemen. Blanchard stated that during the conference of June 12, 1989, he made a decision that the FOP should no longer resist the promotions of minority officers because, otherwise, several of the white officers who were to be promoted would also be denied promotions. The record, thus, indicates that the FOP, as a defendant-intervenor in the *Williams* case, believed it was representing the best interests of a majority of the white police officers by accepting the stipulated settlement agreement; the top eleven white officers from the majority promotional list and two black officers from the minority list were to be promoted to the thirteen available positions for

the rank of detective-sergeant, and four new positions were to be created for minorities, positions for which they were deemed qualified.

Although the FOP did not assert the specific claims of each of the plaintiffs herein, plaintiffs' exclusive bargaining representative, the FOP, became an intervening party in the *Williams* litigation precisely because of its interest in protecting the rights of the white majority police officers. We find that this constitutes "adequate representation" within the meaning of *Martin.* Moreover, as the Second Circuit stated in *Ass'n for Retarded Citizens of Conn. Inc. v. Thorne,* 30 F.3d 367, 372 (2nd Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995), union members are bound by the terms of a consent decree agreed to by the union. All of the plaintiffs, herein, are members of the FOP, which pursuant to Ohio Revised Code, § 4117.10(A), bargains all matters directly dealing with or affecting wages, hours and terms and conditions of employment. Promotions are directly related to wages and terms and conditions of employment; thus, this bargaining representative was acting on behalf of its total bargaining unit, plaintiffs included.

Plaintiffs argue that although the FOP, Lodge No. 28, was a party to the *Williams* case, FOP, Lodge No. 28, Labor Council, was not. They argue that they are members of FOP, Lodge No. 28, Labor Council, which did not intervene in the *Williams* lawsuit, and, therefore, they are not precluded from making this appeal.

This argument has no merit. For purposes of representation of the active members of the Youngstown Police Department, these entities—"FOP, Lodge No. 28," and "FOP, Lodge No. 28, Labor Council,"—are one and the same. The exclusive bargaining agent for the City of Youngstown police officers has for many years been FOP, Lodge No. 28. When Ohio's Collective Bargaining Act was enacted in April 1984, FOP, Lodge No. 28 became a "deemed certified" collective bargaining unit. *See* Ohio Revised Code § 4117.05. However, at some later date, the State Employment Relations Board

("SERB") determined that, under the Act, retirees could not remain in the same bargaining unit with active employees. Hence, the active bargaining unit began calling itself "FOP, Lodge No. 28, Labor Council" for purposes of exclusive representation of active employees under Ohio Revised Code Chapter 4117. SERB recognizes FOP, Lodge No. 28, Labor Council, as the same certified unit that existed prior to the time "Labor Council" was added to its name. The City and its legislative body recognize this group to be the same exclusive bargaining agent for the City of Youngstown's active police officers that existed prior to the change in name. Moreover, plaintiffs indicated on page 8 of their complaint that FOP, Lodge 28, Labor Council, Incorporated was "[p]laintiffs' bargaining unit representative and a defendant-intervenor in the aforementioned Consent Decree." Plaintiffs also concede that the stipulated settlement agreement was entered into on June 12, 1989 "with the apparent acquiescence, participation, and approval of the Chairman of the Fraternal Order of Police, Lodge 28, Labor Council" [Bill Blanchard]. Thus, in their complaint, plaintiffs made no distinction between these two entities. Therefore, the district court properly recognized the FOP, Lodge No. 28, Labor Council, to be the same exclusive bargaining agent that was allowed to intervene in the *Williams* case in 1979.

■ To conclude, because plaintiffs' collective bargaining representative, the FOP, had a meaningful opportunity to appear and be heard as a defendant-intervenor in *Williams v. Vukovich* and adequately represented the interests of majority police officers during the Consent Decree settlement negotiations, including the June 12, 1989 session that resulted in the promotion of six minority officers, plaintiffs lack standing to challenge the 1986 Consent Decree and 1988 settlement agreement. Every police officer, who disapproves of the terms of a consent decree and its impact on him, does not have standing to challenge, in a collateral attack, the terms of

the decree if the interests of majority union members were adequately represented by the appropriate collective bargaining unit, as a defendant-intervenor, in the suit in which the consent decree was negotiated.[3] Therefore, the decision of the district court that plaintiffs lack standing to sue is hereby AFFIRMED.[4]

---

3. It should be noted that this holding is based on the court's analysis of *Martin v. Wilks* and applies only to cases arising prior to the passage of the Civil Rights Act of 1991, which overruled portions of *Martin*.

4. Because we find that plaintiffs lack standing to sue, we do not address the other issues raised by plaintiffs.