Robert SCOTT; Parke Herbert; C. Martin Lawyer, III; Edna Sims; Earl James; Rosalie M. Serrano

v.

The UNITED STATES DEPARTMENT OF JUSTICE; Janet Reno, Attorney General of the United States; State of Florida, by and through Robert Butterworth; and Robert Butterworth, Attorney General of Florida.

No. 94–622.

United States District Court,
M.D. Florida,
Tampa Division.

March 19, 1996.

Stephen N. Zack, Zack, Hanzman, Ponce, Tucker, Korge & Gillespie, P.A., Miami, FL, Benjamin H. Hill, III, Hill, Ward & Henderson, P.A., Tampa, FL, for The Florida Senate, through Senator Jim Scott.

Robert B. McDuff, Law Office of Robert B. McDuff, Jackson, MS, for James T. Hargrett, Jr.

Brenda Wright, Todd A. Cox, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Moease Smith, Wilmateen Chandler, Vivian Kelly, Jesse Nipper, Victoria Brown, Anthony Carswell, Patrice Carswell, Katherine Clark, Earnest Clark, Clarence Fort, Yvonne Fort, Sarah Gooding, Mary Hobley, Emanuel Johnson, Kathy Malone, Nadine McLeod, Elizabeth McMillan, Irma Rodriguez, Rubin Rodriguez, Carl Small, Nina Small, Ben Smith, Jr., Geraldine Tillmon, Michael Tillmon, Julia Timmons, Harold Williams, George Young.

James Maxwell Landis, Foley & Lardner, Tampa, FL, for plaintiffs.

Steven J. Mulroy, Richard B. Jerome, U.S. Dept. of Justice Voting Section, Civil Rights Section, Washington, DC, for The United States Department of Justice, Janet Reno.

George Lee Waas, Peter Antonacci, Attorney General's Office, Dept. of Legal Affairs Tallahassee, FL, for State of Florida, by and through Robert Butterworth.

Stephen N. Zack, Zack, Hanzman, Ponce, Tucker, Korge & Gillespie, P.A., Miami, FL, for The Florida Senate.

Donald B. Verrilli, Jr., Jenner & Block, Washington, DC, B. Elaine New, Florida House of Representatives, Tallahassee, FL, for The Florida House of Representatives.

Parker D. Thomson, Thomson, Muraro, Razook & Hart, P.A., Miami, FL, for Helen Gordon Davis.

**1250**

Charles Gilbert Burr, III, Charles G. Burr, P.A., Tampa, FL, for Florida State Conference of NAACP Branches.

Donald L. Bell, Fla. Dept. of State Office of the Secretary, Tallahassee, FL, for Sandra Barringer Mortham.

Before TJOFLAT, Chief Circuit Judge, and NIMMONS and MERRYDAY, District Judges.

### FINAL ORDER

MERRYDAY, District Judge:

This action began with a complaint filed on April 4, 1994, in which Robert Scott and others sued the United States Department of Justice and the State of Florida and challenged the configuration of District 21 of Florida's Senate. The court permitted intervention by (1) the Florida Senate; (2) Senator James T. Hargrett, Jr., the incumbent representative of District 21; (3) Moease Smith and others, some of whom are residents and some of whom are non-residents of District 21 but all of whom are African–American or Hispanic individuals with an interest in District 21; and (4) Sandra B. Mortham, Florida's Secretary of State, whose constitutional and statutory responsibility includes the superintendence of Florida's elections.

Florida's House of Representatives sought intervention also but unaccountably declined to announce whether the intervention was in support of, or in opposition to, the current boundaries of Senate District 21. Unable to knowledgeably align the House as a plaintiff or defendant, the court on July 26, 1995, extended to the House the option to appear at all stages of these proceedings either as a plaintiff, as a defendant, or as *amicus curiae*, or to appear in either of these capacities during only the remedial stage (if District 21 were found unlawful). The House elected to immediately appear *amicus*, keeping its view of District 21 largely to itself. (The House's view of District 21 remains elusive because, after alignment as a defendant, the House filed a largely opaque answer to the complaint. Similarly, an affidavit by Peter Rudy Wallace, Speaker of the House, accompanying the settlement proposal is essentially silent on the legality of District 21.)

The complaint alleges that District 21 "was drawn specifically to encompass members of minority groups with divergent interests residing in several different communities" and "is so irregular that it clearly cannot rationally be understood as anything other than an attempt to segregate the races for purposes of voting." The complaint seeks relief under the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 2412. C. Martin Lawyer, III, is among the plaintiffs who in the initial complaint allege that District 21 is unconstitutional and who seek relief from District 21 as presently drawn. The claims for relief in the complaint require a three-judge panel under 28 U.S.C. § 2284(a).

On January 9, 1995, after the parties' exchange of sundry papers and after a subsequent oral argument, the court denied, among others, motions to dismiss and to transfer. Thereafter, a period of inactivity was permitted for the purpose of awaiting decision by the Supreme Court of the United States in two cases of obvious importance to the law governing this controversy. On June 29, 1995, the Supreme Court resolved *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), and *U.S. v. Hays*, —— U.S. ——, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). On July 6, 1995, the court held a status conference to discuss with the parties and other interested persons both the effect of the Supreme Court's recent decisions and the future course of this litigation.

During the July 6, 1995, hearing, the parties and others responded to inquiries from the court by announcing that they anticipated no spontaneous effort by the State of Florida to alter District 21 in response to *Miller*. All parties suggested that further litigation on the merits was the probable course. However, speaking on behalf of the Senate, attorney Benjamin H. Hill, III, suggested the possibility of mediation. After receiving the comments of counsel, the court concluded that mediation offered a preferable and feasible alternative to the uncomfortable intervention inherent in federal judicial resolution of issues affecting state government.

Mediation began promptly.[1]

Consequent upon receipt of the information that the terms of a proposed resolution had congealed, a hearing was held on November 2, 1995, at which the parties and members of the public were present. Florida's House and Senate as well as all other parties (except plaintiff Lawyer) manifested both the authority to consent and actual consent to the terms of the proposed resolution, which includes a modified configuration of District 21. At the November 2 hearing, the court discussed the pretrial statement submitted by the parties. In Exhibit B of the pretrial statement (Exhibit B is entitled "Plaintiff Martin Lawyer's Statement of the Case"), plaintiff Lawyer specifically adopts Exhibit A of the "Statement of the Case" submitted by plaintiff Scott and others. Exhibit A states in part that:

> As a result of the Supreme Court's decision in the *Miller* case, there are no issues of law to be decided by the Court in this matter. The instant action is directly analogous to, and therefore controlled by, the *Miller* opinion. *Accordingly, the only issue which should remain for the Court to decide at the trial on this matter is the issue of the appropriate remedy.*

(Emphasis added.)

Accordingly, the court ruled as follows from the bench:

> [I]t seems to me clear beyond peradventure that there is no remaining litigable matter affecting the jurisdiction of the court to proceed to a remedial consideration of this controversy.... [T]he issue perhaps then becomes one to be taken up at a fairness hearing....

> ....

> ... [W]e ought simply then to proceed on November the 20th at 9:30 a.m. ... to resolve the issue of the fairness of this proposed settlement and entertain any objections, including those from the plaintiff Lawyer or others, concerning the details of this district.

On November 20, 1995, the three-judge panel (with Chief Judge Tjoflat presiding) convened a "fairness" hearing to entertain argument from the parties, comments from the public, and any relevant evidence concerning the terms of the proposed resolution. This order emanates from the proceedings on November 20 at which the parties asked this court to authorize a restatement of the boundaries of District 21.

The redrawing of state legislative districts by a federal court presents several issues. The first issue pertinent in this case is the threshold evidence, stipulation, or the like necessary to activate the court's authority under the Fourteenth Amendment to compel the nullification and re-establishment of state legislative boundaries that were established after exhaustion of the procedures contemplated by Florida's constitution and by applicable federal statutes.

 At pages 9–11 of the "Brief of the United States in Support of Proposed Settlement," filed on September 26, 1995, and again at pages 1–4 of the "United States' Brief in Support of Settlement Agreement of November 2, 1995," filed on November 17, 1995, the Attorney General outlines the basis for this court's enforcement of the parties' proposed resolution. Even if none of the cases cited by the Attorney General precisely mirrors the facts of this case, the fortifying principles are indistinguishable. A trial court in a case such as this may exercise

---

1. Lawrence G. Mathews, Jr., of Orlando, Florida, was designated by the court as the mediator and was invested with broad discretion to conduct mediation in a manner and among persons determined by him to be necessary and proper to the resolution of the dispute. After some pronounced tribulation among the participants during the mediation, Mr. Mathews was able to report to the court the apparent consensual resolution of this dispute. A hearing was scheduled for September 27, 1995. As of that day, the House was neither a formal party to this action nor in agreement with the proposed resolution and C. Martin Lawyer, III, a plaintiff, asserted objections both to his continuing representation by the law firm of Foley & Lardner and to the putative settlement. At the September 27 hearing, the three-judge panel decided to admit the House as a party and commit the action again to mediation in an effort to effect a plan in which all interested parties concurred. Mediation proceeded and, after some apparently exhaustive sessions, a proposed resolution resulted. The House now concurs with the proposed resolution. C. Martin Lawyer, III, objects to the proposed resolution.

authority under the Fourteenth Amendment if, after a careful evaluation of the terms of the proposed resolution and the details of the underlying dispute, the court concludes that the case presents a sufficient evidentiary and legal basis to warrant the *bona fide* intervention of a federal court into matters typically reserved to a state. In that circumstance, the State of Florida, the plaintiffs, and other participants may propose a resolution to this action without a dispositive, specific determination of the controlling constitutional issue. In other words, the State of Florida is at liberty, acting through its lawfully empowered officials, to consent to a legislative districting adjustment if (1) a material constitutional issue exists (that is, if a plausible and fairly contestable legal or factual issue underlies the dispute) and (2) the state prefers to act volitionally to avert both an expensive and protracted contest and the possibility of an adverse and disruptive adjudication.[2] As Justice O'Connor observes in the context of an employment discrimination case:

> The imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. This result would clearly be at odds with this Court's and Congress' consistent emphasis on "the value of voluntary efforts to further the objectives of the law." The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance.
>
> . . . .
>
> This conclusion is consistent with our previous decisions recognizing the States' ability to take voluntary race-conscious action to achieve compliance with the law even in the absence of a specific finding of past discrimination. Indeed, our recognition of the responsible state actor's competency to take these steps is assumed in our recognition of the States' constitutional *duty* to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination.

*Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 290–91, 106 S.Ct. 1842, 1855–56, 90 L.Ed.2d 260, 279–80 (1986) (citations omitted) (emphasis in original).[3]

---

**2.** In this case, the dissenting plaintiff Lawyer now demands an adjudication that District 21 is composed unconstitutionally. However, the law allows for a consensual remedy in the absence of a public *mea culpa* by a litigant—as well it should. Of course, parties cannot connive to achieve narrow political interests by lodging complaints in a federal court, contriving to "settle" the litigation, and thereby affecting the interests of the public by manipulation of the federal judiciary. It is primarily for that reason that the court has a responsibility to telescopically inspect the controversy and guard against any disingenuous adventures. Among the adventures against which the court serves as a protector is the excessive (even intoxicating) acquisition of effective power over public affairs by a private individual with unspecified motives. In short, a court resolving a governmental or intrinsically public matter cannot act as a hostage to private interests. As stated in *Sheffield v. Itawamba County Board of Supervisors*, 439 F.2d 35, 36 (5th Cir.1971):

> The appealing plaintiffs have been awarded the very relief they originally prayed for—a court order requiring the Board of Supervisors of Itawamba County to redistrict the county in conformity with legal standards. The appeal is provoked because plaintiffs now prefer that the order require the county to hold elections for the various supervisors' posts on a basis whereby candidates from each presently composed district could run in a county-wide election. *However, having instituted a public lawsuit to secure rectification for a constitutional wrong of wide dimension, they cannot privately determine its destiny.*

(Emphasis added). Plaintiff Lawyer's complaint sought to have the state of Florida replace District 21 with a constitutional district. He got it.

**3.** The special concurrence identifies from the motion to approve the settlement a statement that the "defendants 'do not admit liability'." The special concurrence notwithstanding, an expanded recitation from the motion is revealing:

> While the defendants and defendant-intervenors do not admit liability, they do admit for the purpose of settlement only that a reasonable factual and legal basis exists for plaintiffs' constitutional claim....

The Settlement Agreement similarly states in paragraphs 2, 3, and 4:

> Defendants and defendant-intervenors deny these assertions [of unconstitutionality]. The parties nonetheless do agree, for the purpose of settlement only, that based upon the evidence of record, there is a reasonable factual and legal basis for the plaintiffs' claim. The

■ The boundaries of current District 21 are markedly uneven and, in some respects, extraordinary (but not without precedent and certainly not the most extraordinary boundaries in Florida's Senate). Some legislators concede that awareness of race was not wholly absent from the formulation of District 21. The record confirms that the racial composition of District 21 is somewhat dissimilar from the racial composition of the larger, encompassing geographical area. These facts acquire *controlling significance* when evaluated in accord with *Miller*, which states:

> Federal court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that "reapportionment is primarily the duty and responsibility of the Senate." Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests. Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed. The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial

demographics; but it does not follow that race predominates in the redistricting process. The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race. The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can "defeat a claim that a district has been gerrymandered on racial lines."

parties recognize that litigation of plaintiffs' claims will be expensive and time-consuming, and will entail significant risks for both sides, especially because of the unsettled nature of the law in this area. The parties further recognize that litigation of these claims is likely to be protracted, causing an undesirable uncertainty in the electoral process. In order to conserve resources, reduce risk, and obtain certainty and finality in the electoral process, the parties have agreed to resolve this dispute through compromise.

For these reasons, the parties (other than plaintiff Lawyer) entered the resolution. The reservation to which the special concurrence refers arises from the settling parties' concern that the three-judge panel might adopt a remedy materially departing from proposed District 21. If so, the defendants wanted to defend the present plan on the merits. (See transcript of November 2, 1995, at pp. 30–31.)

Each party either states unequivocally that existing District 21 is unconstitutionally configured or concedes, for purposes of settlement, that the plaintiffs have established *prima facie* unconstitu-

tionality. The record contains a sufficient factual and legal basis to validate the conclusion that the plaintiffs' claims are fairly litigable on the merits. The Florida legislature, the governmental body to which redistricting responsibilities are constitutionally delegated, has presented a palpably constitutional remedy. Under these circumstances, no specific adjudication of unconstitutionality is necessary.

Sound policy commends the majority's approach. The expressed conditions of the Florida legislature's participation in the resolution of this dispute include both (1) acceptance by the court of the adequacy of the *prima facie* legal standard (supported by the Department of Justice) and (2) adoption of a remedy not materially at variance from Plan 386. We are persuaded by Chief Judge Parker's opinion in *Moch v. East Baton Rouge Parish School Bd.*, 533 F.Supp. 556 (M.D.La.1980), especially his insightful observation that "[i]f public bodies must admit guilt in order to settle [voting rights] cases, then settlements are going to be few and far between."

*Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762, 779–80 (1995).

■ Measured against the standard prescribed by *Miller,* the pleadings and other papers in this case present a *bona fide,* justiciable, and fairly contestable dispute, which implicates important governmental interests and which the parties are at liberty to settle without risk of offense against the integrity of either the state's discretion in legislative districting or the federal court's authority attendant to the Fourteenth Amendment. In response to the dispute, the parties present for consideration a newly defined District 21, which is designated by the parties as Plan 386.

■ *Miller* directs that the governing constitutional issue includes due deference to both the ponderous task of legislative districting as well as to the wholesome consideration by publicly elected representatives of the meaning and definition of a community, i.e., a community of persons and a community of interests, both of which are evolving and only imprecisely measurable. The issue of community presents itself most prominently in this case because part of proposed District 21 is physically separated by a natural geological and geographical peculiarity (Tampa Bay) from the balance of the proposed district and because more than one county is included in proposed District 21.

Describing the notion of community is a stubborn problem. Viewed optimistically, a community is definable as individuals who sense among themselves a cohesiveness that they regard as prevailing over their cohesiveness with others. This cohesiveness may arise from numerous sources, both manifest and obscure, that include geography (which, as in this case with the politically inconvenient expanse of the waters of Tampa Bay, is often uneven and intrusive in its boundaries), history, tradition, religion, race, ethnicity, economics, and every other conceivable combination of chance, circumstance, time, and place. (Given the persistent disharmony among us, a community is perhaps more grimly definable as an array of persons who prefer disagreement among themselves to disagreement with others.) In any event, a community is based finally and unappealably on the society and consent of its members, both of which are known best by the community's members. A community is exactly what a community believes itself to be. A community is—using the term "political" in the salutary sense—a political fact that candidates should study, officeholders must remember, and districting authorities should insinuate into their designs.

A constitutional and commendable factor in assessing the propriety of a legislative district is the society and consent of the members of that district and, to the extent applicable, of any included community. This is, after all, a republic, which implies a right in the people to accomplish their collective will and an obligation in the government to honor that will if the organic law permits. Therefore, notwithstanding the political aspirations of some or the schemes of others for improving the state of public affairs, the society and consent of a body politic comprising a community is a factor prominent among those factors that a court ought to evaluate in adopting a plan for redistricting. (This is not to say that the Constitution requires quiet contentment among every constituency. That may be unachievable. However, in searching for some unconstitutional iniquity, the consent or opposition of those touched by a matter is certainly a rational consideration.)

■ The Constitution neither prohibits the existence of a legislative district comprising the residents of a single community nor requires the dissection of a community because the community's residents are identifiable by some common bond, such as ethnicity, race, or religion. The Constitution does not forbid the combination or agglomeration of communities. The Constitution neither requires nor forbids districts contained in a single county (an impossibility in Florida). In fact, the Constitution does not and could not require any particular district—that notion is preposterous. The Constitution presumes to prescribe very few details. It suffices to say that the Constitution forbids districting motivated and dominated by the single-minded focus on a prohibited criterion, which in this case the plaintiffs allege is race.

Therefore, the conclusion is obvious that the plaintiffs sufficiently allege a cognizable, constitutional dispute concerning present District 21, which bears at least some of the conspicuous signs of a racially conscious contrivance. On the other hand, it is equally obvious that a cognizable, constitutional objection to the proposed District 21 is not established. In its shape and composition, proposed District 21 is, all said and done, demonstrably benign and satisfactorily tidy, especially given the prevailing geography.

The composition of District 21 has excited public discussion for many months. The news media have dispersed the story. The politicians have expostulated both locally and statewide. In contrast to the tradition arising from disputes among parties with only their discrete interests at stake, the mediation of this public dispute, which involves the public interest, has occurred in the light of public observation. All interested and willing persons have availed themselves of the opportunity to speak. Several court hearings have occurred. Most importantly, notice of the November 20 hearing on the terms of the proposed resolution was widely published and the details of the proposed resolution were published, generally known, and available in original and detailed form in the office of the clerk of this court. After public announcements and discussions, which included a dose of conspicuous disagreement among certain observers, the November 20 hearing produced but two dissenters, plaintiff Lawyer and a former state Senator, both of whom neither presented relevant evidence nor offered germane legal argument. Except for Lawyer, no resident of District 21 arose to object, despite Chief Judge Tjoflat's open invitation. Both common sense and the history of this litigation suggest that the residents of District 21 regard themselves as a community and experience considerable comfort with the proposed resolution. (Remarkably, even plaintiff Lawyer in his deposition attests to his contentment with the representation of Senator James Hargrett, the incumbent in District 21.)

■ Although the court notes the presumptive consent of the residents of District 21 to the terms of the proposed resolution, the governing fact remains that districting is a legislative function of the state, which yields to the federal courts only upon the identification of a constitutional defect (or perhaps in statutory matters not pertinent here). The federal courts are not constituted or authorized to determine (assuming hypothetically that judges possess the requisite wisdom) the best possible district for each place (assuming hypothetically that a "best possible district" exists). If jurisdiction is properly invoked, as in this case, the limited role of a federal court is to ascertain whether the legislatively described district is among that boundless number of possible and constitutional districts and not among the equally boundless number of possible and unconstitutional districts. The court approaches this formidable task with caution and sincere deference to legislative discretion.

Foremost among the factors commending the proposed resolution in this action is the consent of Florida's Senate and House, as well as the preclearance of the United States Department of Justice and the concurrence of Florida's Attorney General and Secretary of State. While assisted tellingly by mediation, proposed District 21, like present District 21, is primarily a legislative action and is advanced to this stage by this court preeminently for that reason. Section 16(a) of Article III of Florida's constitution provides that the legislature by joint resolution shall periodically reapportion itself. Absent an offense against the Constitution, this court necessarily respects the will of the legislature as manifested in this instance by the consent of both the President of Florida's Senate and the Speaker of Florida's House of Representatives.

Happily, there is much to commend the legislative solution expressed by the boundaries of proposed District 21 (Plan 386). Plan 386 is racially less recognizable and distinctive than present District 21, which is to say that Plan 386 reduces the percentage of minority constituents and more closely approximates the racial features of the larger geographic region surrounding Tampa Bay. The boundaries of Plan 386 are less strained and irregular than present District 21. An observant and informed analyst of Plan 386

is not startled or impelled toward incredulity by the proposed district's configuration or composition. But most importantly, Plan 386 offers to any candidate, without regard to race, the opportunity to seek elective office and both a fair chance to win and the usual risk of defeat—neither of which is properly coerced or precluded by the state, the court, or the Constitution. Candidates should compete and either win or lose based on their talent, their good fortune, and their views. Nothing about Plan 386 is determinative of an electoral outcome—because of race or otherwise.

These perspectives, distilled from the record, are an encapsulated view by the court of the apparent wisdom of Plan 386. However, the legislature's view (not this court's view) of the wisdom of Plan 386 controls (absent a constitutional infirmity). The legislature makes the pertinent choice and the legislature has chosen Plan 386.

The court's limited review of Plan 386 concludes with approval—constitutional approval arising from applicable precedent and practical approval arising from an appreciation of the considerable legislative achievement writ large in Plan 386. Stated differently, considered both afresh and in light of the Supreme Court's long history of apportionment decisions, particularly since *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Plan 386 passes any pertinent test of constitutionality and fairness.

For the reasons expressed, the court adjudges as follows: [4]

(1) The "Joint Motion to Approve Settlement" (Doc. 185) is **GRANTED.**

(2) All other pending motions are **DENIED.**

(3) Districts 13, 17, 19, 21, 22, and 23 are modified and redistricted, effective immediately, in accordance with the description, which is incorporated by reference into this order, appearing at Tab 14 of Exhibit 1 to the "Notice of Filing Declarations and Affidavits in Support of Settlement Agreement of November 2, 1995" (Doc. 188).

(4) The court retains jurisdiction pending further order for the limited purpose of assessing attorneys' fees and costs, if any.

ORDERED.

TJOFLAT, Chief Circuit Judge, specially concurring:

I concur in the court's judgment incorporating as a remedy the redistricting plan for Senate District 21 proposed by the Florida legislature because I am convinced of two things. First, District 21, as presently drawn, is the product of racial gerrymandering and thus cannot be squared with the Equal Protection Clause of the Fourteenth Amendment. *See Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Second, the legislature's proposed remedy is constitutional.

The majority believes that we can enter a final judgment in this case without deciding the threshold constitutional issue because (1) the defendants concede in their Joint Motion to Approve Settlement that "a reasonable factual and legal basis exists for plaintiffs' constitutional claim," i.e., a *prima facie* claim exists, and (2) the defendants have agreed that the remedy the court adopts today is constitutional. The majority ignores the fact that, in their Joint Motion to Approve Settlement, the state defendants insist that they "do not admit liability."

As the majority acknowledges, the judgment the court enters today is not a consent judgment. *See White v. Alabama*, 74 F.3d 1058, 1073–74 (11th Cir.1996). It therefore follows that, to enter the judgment in question, the court must find that District 21 is

---

4. Because plaintiff Lawyer objects to Plan 386 (as well as to present District 21), this Final Order is not a typical, plenary consent decree that disposes of all aspects of liability and remedy by consent. Rather, it is in the nature of a hybrid consent decree that disposes of liability by consent and affords a remedy resulting from a partial settlement and an adversary hearing similar to a fairness hearing. Judge Rubin discusses hybrid consent decrees in *United States v. City of Miami, Fla.*, 664 F.2d 435 (5th Cir.1981) (en banc). *See generally Manual for Complex Litigation 3d.*, §§ 23.14 and 23.21 (1995).

unconstitutional.[1] The court can do this without such a finding only if it treats the state defendants' Joint Motion as conceding the issue of liability. Obviously, in the face of the explicit denial quoted above, the court cannot do that.[2]

I would resolve the issue of District 21's constitutionality on the record before us. The state defendants readily acknowledge the existence of a *prima facie* case of liability, and they have expressed no desire to contest this point by rebutting the plaintiffs' case. In short, the evidence in this case has been closed. It is as if we have held a bench trial and taken the case under submission. Accordingly, were I writing for the majority, I would find that District 21 is the product of racial gerrymandering in violation of the Equal Protection Clause.

With respect to the remedy that this court should then impose, I subscribe in full to the majority's conclusion that the redistricting plan that the Florida legislature has proposed, and that we adopt today, is constitutional. I therefore concur in the court's final order.

---

1. A reader of the majority's order might conclude that my view has changed since the hearing held in this case on November 2, 1995. Such is not the case. I did not participate in the November 2 hearing; that hearing was presided over by Judge Merryday sitting alone.

2. The majority seems to read the settlement papers as containing the requisite concession of liability. *See ante* at 1253 n. 3. I do not agree with such a reading.