**CLEVELAND COUNTY ASSOCIATION FOR GOVERNMENT BY THE PEOPLE, et al., Plaintiffs,**

v.

**CLEVELAND COUNTY BOARD OF COMMISSIONERS, et al., Defendants.**

**Civil Action No. 96–1447.**

United States District Court, District of Columbia.

May 19, 1997.

Neil C. Williams, Horack Talley Pharr & Lowndes, Charlotte, NC, Robinson O. Everett, Durham, NC, for Cleveland County Association for Government by the People, Gaines B. Washburn, Lester D. Roak, Kyle Smith.

Neil C. Williams, Horack Talley Pharr & Lowndes, Charlotte, NC, for Sandra S. Allen, George H. Morris, Jr., Glenn A. Short.

Michael Crowell, Ruth Dowling, E. Hardy Lewis, Tharrington, Smith & Hargrove, Raleigh, NC, Julian B. Wray, Church, Paksoy & Wray, Shelby, NC, for Cleveland County Board of Commissioners, Cecil D. Dickson, Sam Gold, Edwin T. Vanhoy, Ralph L. Gilbert, James E. Crawley, Mary Accor, Bobby C. Malloy.

Elizabeth Johnson, U.S. Department of Justice, Civil Rights Division, Washington, DC, for U.S. amicus.

J. Gerald Herbert, Alexandria, VA, for Center for Voting and Democracy amicus.

Harvey Lloyd Pitt, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Harvey L. Pitt amicus.

Kevin J. Lanigan, Hogan & Hartson, L.L.P., Washington, DC, for National Association for Advancement of Colored People, M.L. Campbell, C.D. Montgomery, John N. Osborne, Jr., Eddie Evans, Jr., Maggie M. White, Robert E. Devoe, Julie C. Brooks, Clarence L. Brantley, Glenwood J. Carson.

## MEMORANDUM OPINION

SPORKIN, District Judge.

The plaintiffs in this case are individual registered voters of Cleveland County, North Carolina, and the Cleveland County Association for Government by the People ("CCAGP"), an unincorporated association.[1]

This matter is before the Court now on (1) Plaintiffs' Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment; (2) Defendant Cleveland County Board of Commissioners' (the "Board of Commissioners") Motion to Dismiss; and (3) Defendant National Association for the Advancement of Colored People's (the "NAACP") Motion to Dismiss. The Court has considered the motions and the opposition thereto, and has received and considered *amicus curiae* briefs from the United States; the mediator (the "Mediator") in the case of *Campbell v. Cleveland County Board of Commissioners*, Civ. No. 94–0845–S § (the *"Campbell Case"*), Mr. Harvey L. Pitt, Esq.[2]; and the Center for Voting and Democracy.[3] The Court heard oral argument on May 6, 1997.

## BACKGROUND

From 1966 to 1994 the Cleveland County Board of Commissioners in Cleveland County, North Carolina, consisted of five members elected from the county at-large in partisan elections for four-year staggered terms. Elections were held in even-numbered years. In the 1990 census, African–Americans constituted 20.9 percent of the county's total population of 84,714 and 18.8 percent of the voting age population. Through the 1994 election, no black citizen ever had been elected to the Board of Commissioners.

Following a 1991 request from the local chapter of the NAACP, the Board of Commissioners initiated a study of Cleveland County's election method and whether it could be modified to improve the ability of black citizens to elect candidates of their choice. In October 1992 a study committee created by the commissioners recommended

---

1. Plaintiffs' Second Amended Complaint describes the CCAGP as a "nonpartisan, voluntary, unincorporated, non-profit association of citizens of Cleveland County and of other persons who are opposed to unconstitutional methods for the election of public officials in Cleveland County." Second Amended Cmplt, page 2.

2. Mr. Pitt is a partner in the law firm of Fried, Frank, Harris, Shriver & Jacobson, and is based in Washington, D.C. and New York. He took on the role of mediator in the case on a pro bono

basis. It was largely through his unstinting efforts that the case was settled.

3. The Center for Voting and Democracy (the "Center") is a non-partisan, non-profit corporation, incorporated in the District of Columbia for educational purposes. The Center researches and distributes information on electoral systems that promote voter participation and fair representation. The Center has special interest in the theory and practice of limited voting plans.

expansion to a seven-member board, five to be elected from districts and two at-large. One of the districts would have had a majority of black citizens. Legislation to authorize the county to adopt such a plan was enacted by the North Carolina General Assembly in 1993. The legislation expired by its own terms in January 1994, however, as the Board of Commissioners was unable to agree on a districting plan.

In January 1994 M.L. Campbell, other black citizens of Cleveland County, and the NAACP filed the *Campbell* Case in the United States District Court for the Western District of North Carolina, contending that the method of electing county commissioners violated Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (the "Voting Rights Act"). The *Campbell* Case was transferred to the District of Columbia on April 15, 1994. On May 19, 1994, the Court appointed the Mediator, without objection from the parties, to assist the parties in resolving their disputes. *The Campbell* Case was resolved by the Court's approval of a consent decree on July 22, 1994 (the "Consent Decree").

The Consent Decree adopted an election plan (the "Election Plan") that provided for an expansion of the Board of Commissioners to seven members, and the eventual adoption of at-large, limited voting in the election of Commissioners. For the 1994 and 1996 elections, the old methods remained in place with two notable exceptions: (1) the members of the Board of Commissioners elected in 1996 would serve only two years; and (2) after the 1994 election, two additional Commissioners who were "representative of the black community in Cleveland County" would be appointed to the Board for four-year terms. Consent Decree ¶ 5a. Beginning with the 1998 election all seven seats would be elected at the same time, with newly-elected commissioners to serve at-large. In both party primaries and the general election, each voter would be allowed to cast up to four votes for different candidates, with the top seven candidates to be elected.

The Consent Decree was subject to pre-clearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. It was submitted and was precleared by the United States Attorney General on September 26, 1994. The Board of Commissioners thereafter appointed the two new commissioners and those appointments were approved by the Court. Both new commissioners took office in September 1995.

Plaintiffs filed the immediate case in the Western District of North Carolina on January 5, 1996. This case was transferred to this Court in June 1996. Plaintiffs' Second Amended Complaint asserts two causes of action: (1) the Consent Decree violates (a) the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because the Consent Decree is allegedly "race based" and (b) the Fifteenth Amendment because it allegedly abridges Plaintiffs' right to vote on account of Plaintiffs' race by denying them the right to vote for the two appointed Board members; and (2) this Court lacked authority to issue an order implementing the Consent Decree because the Consent Decree is contrary to North Carolina law and the Court made no finding that the old method of electing members of the Board of Commissioners violated federal law. It is the contention of Plaintiffs that the recent cases of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("*Shaw* I") and *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*") are controlling here.[4] Plaintiffs have moved for judgment on the pleadings or, in the alternative, for summary judgment, and ask that the Court vacate the Consent Decree, provide additional injunctive relief, and award fees.

---

**4.** *Shaw v. Reno* and *Shaw v. Hunt* were related actions brought by North Carolina residents seeking to challenge North Carolina's congressional redistricting plan. In *Shaw v. Reno,* the Supreme Court held that North Carolina's redistricting legislation was so extremely irregular on its face that it could rationally be viewed only as an effort to segregate races for the purpose of voting, without regard to traditional districting principles and without sufficiently compelling justification. Plaintiffs' complaint had sufficient weight to be considered a claim upon which relief could be granted under the Equal Protection Clause. In *Shaw v. Hunt,* the Supreme Court held that the redistricting plan was not narrowly tailored to serve a compelling state interest and violated the Equal Protection Clause.

Defendant Board of Commissioners has moved to dismiss, claiming that Plaintiffs lack standing to bring this action and that Plaintiffs cannot show that the Election Plan is a race-based measure. Defendant NAACP has moved to dismiss, also claiming that Plaintiffs lacked standing to bring this action and that Plaintiffs cannot show that their interests were not represented in the *Campbell* Case by their elected representatives on the Board of Commissioners.

The United States argued in its *amicus* brief that *Shaw* I does not require that every consent decree entered to resolve Section 2 litigation automatically states a claim for an equal protection violation or that all such consent decrees are automatically subject to strict scrutiny. The government claims that Defendant Board of Commissioners' motion to dismiss should be granted, at least in part because Plaintiffs have failed to allege facts to establish that the permanent limited voting plan embodied in the Consent Decree violates the Equal Protection Clause of the Fourteenth Amendment.

The Mediator argued in his *amicus* brief that the Consent Decree does not violate the Fourteenth Amendment or the Fifteenth Amendment and that the Court had authority to enter the Consent Decree. The Center for Voting and Democracy claimed in its *amicus* brief that the limited voting plan adopted by Cleveland County has, at most, a modest effect on election outcomes, since it does not guarantee any seats on the Board of Commissioners to blacks, nor does it give black voters any more voting power than other voters.

## ANALYSIS

### I. Plaintiffs Have a Proper Basis For Bringing this Action

#### A. Plaintiffs Have Standing

Defendants Board of Commissioners and the NAACP challenge Plaintiffs' standing to bring this case, so the Court will address standing as a threshold matter.

"In order to establish standing under Article III, a complainant must allege (1) a personal injury-in-fact that is (2) 'fairly traceable' to the defendant's conduct and (3) redress able by the relief requested." *Branton v. Federal Communications Comm.*, 993 F.2d 906, 908 (D.C.Cir.1993); (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994). In addition, "[t]he alleged injury must be 'distinct and palpable.'" *Branton*, 993 F.2d at 908 (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). "A plaintiff who seeks to challenge [governmental] practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508, 95 S.Ct. at 2210. More particularly, an association must allege that it has been injured by the challenged action or "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justifiable case had the members themselves brought suit." *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211–12.

Plaintiffs have standing in this case. They are registered voters and citizens of Cleveland County bringing an action concerning an alleged violation of the Equal Protection Clause with respect to the election procedures used in their county. In *Shaw* II and *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), the Supreme Court made clear that a plaintiff who resides in a district which is the subject of a racial gerrymandering claim had standing to challenge the legislation which created that district. It would be consistent with the governing principles established by the Supreme Court in those cases to conclude that standing should also extend to resident voters who make a colorable claim that they have been subjected to an alleged constitutionally impermissible voting scheme brought about as the result of the settlement of litigation by their elected representatives.[5]

---

**5.** Indeed, if the Court accepted the logic of the NAACP's arguments on standing, then the Court might have to conclude that the NAACP was not

Defendants' motion to dismiss on the grounds that Plaintiffs lacked standing to bring this action will be denied.

### B. Plaintiffs Are Not Estopped From Bringing This Action

Defendant NAACP argued that this action should be dismissed because it improperly seeks to relitigate the precise dispute that the Court conclusively resolved in its July 22, 1994 order approving the Consent Decree. The NAACP claimed that Plaintiffs have not alleged—and cannot show—that their interests as Cleveland County citizens were not adequately represented in the *Campbell* Case by their own elected representative, the 1994 members of the Board of Commissioners. In essence, the NAACP argued that the CCAGP should be estopped from challenging the Consent Decree in a separate action.

 The Court finds that Defendant NAACP's argument on adequate representation should not be accepted in the immediate case. The Eleventh Circuit has addressed the issue of adequate representation in a case similar to this one. *See Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471 (11th Cir.1993). In that case, black and Hispanic citizens and registered voters brought an action against the county for an alleged violation of the Voting Rights Act by diluting voting power in at-large elections for county commissioners. The district court found for the plaintiffs and, when the county commissioners decided not to appeal, registered voters filed motions to intervene for purposes of appeal which the district court denied. The Eleventh Circuit reversed the denial of a motion to intervene and stated that "we disagree with the district court's conclusion that the county defendants were adequate representatives of the intervenors because they had identical interests ... divergent interests created a risk that Dade County might

not adequately represent the applicants." *Id.* at 1478.

In this case, the Plaintiffs are situated similarly to the intervenors in *Meek*. Their interests and those of Cleveland County arguably are materially different.

What is more, it appears that Plaintiffs may not have had adequate opportunity to challenge the Consent Decree before the Board of Commissioners approved it. Plaintiffs represented to the Court that there were no public hearings on the Consent Decree prior to its acceptance by the Board of Commissioners and little publicity was given to the case within Cleveland County. The Court also finds that Plaintiffs brought this case as soon as was reasonably possible after the Court approved the Consent Decree.

Defendant NAACP's motion to dismiss this matter as an effort to relitigate the *Campbell* Case will be denied.

### II. Challenges To The Authority for Approving and Entering the Consent Decree

#### A. The Court Did Not Need An Admission or Finding of a Section 2 Violation to Enter the Consent Decree

Plaintiffs point out that the Court did not adjudge a violation of Section 2 of the Voting Rights Act in the *Campbell* Case.[6] In the absence of any finding (or admission) that federal law had been violated, Plaintiffs argue that the Court lacked authority to enter the Consent Decree and should have left any modification of Cleveland County's election plan to the North Carolina legislature.

The specific issue of whether a court must find a violation of Section 2 of the Voting Rights Act before entering a consent decree is unsettled among the circuits and has not been addressed by this circuit.[7] It should be

---

a proper plaintiff in the *Campbell* Case that led to the Consent Decree.

**6.** As stipulation 9 of the Consent Decree stated: "Nothing in this Consent Decree is intended as an adjudication of the lawsuit, nor is the entry of this decree intended in any manner to imply that the county's election system has violated Section 2 of the Voting Rights Act or the Fourteenth Amendment."

**7.** It does appear that a resolution is imminent. The Supreme Court heard argument on February 19, 1997 on a voting rights case wherein a three-judge panel in the Middle District of Florida upheld a trial court's entering of a consent decree. *Scott v. US. Department of Justice*, 920 F.Supp. 1248 (M.D.Fla.1996) *juris. noted sub norm. Lawyer v. Department of Justice*, —— U.S. ——, 117 S.Ct. 292, 136 L.Ed.2d 212, and mo-

noted that the Fourth Circuit has viewed the altering of an election method through a consent decree as a valid and binding means for settling a dispute.[8]

█ This Court finds that a trial court has the authority to enter a consent decree in a Voting Rights Act case without first finding a Section 2 violation. Courts have repeatedly upheld the validity of consent decrees in analogous situations without requiring admissions of wrongdoing or court findings against one of the parties. *See, Armstrong v. Adams,* 869 F.2d 410 (8th Cir.1989)(upholding the district court's approval of a consent decree in a case involving allegations of unconstitutional race discrimination in a state election); *Moch v. East Baton Rouge Parish School Bd.,* 533 F.Supp. 556 (M.D.La.1980); *Moore v. Beaufort County, N. C.,* 936 F.2d 159 (4th Cir.1991).

It would make little sense to deny trial courts the authority to enter consent decrees without finding Section 2 violations in Voting Rights Act cases. Consent decrees are agreements which, by their nature, forge consensus among the parties in order to avoid adjudication on the merits of the claims. It is fair to conclude that, if "public bodies must admit guilt in order to settle [voting rights] cases, then settlements are going to be few and far between." *Moch,* 533 F.Supp. at 556. If a court had to first adjudge a Section 2 violation, the plaintiffs—having established liability—would have little incentive to negotiate a consensual resolution of their claims.

The Court did not operate in a vacuum before entering the Consent Decree. There was ample evidence to conclude that the plan was fair and reasonable and arguably necessary to remedy alleged violations of the Voting Rights Act. Resolving, unnecessarily, the issue of whether a Section 2 violation actually had occurred likely would have undermined the negotiation of a consent decree that enjoyed considerable support from parties and non-parties alike. As a guiding principle, the Court has always believed a settlement vigorously negotiated by parties of equal bargaining strength was almost always the preferred way to resolve a lawsuit. The concept of requiring an unconditional surrender by one of the parties to a lawsuit would bring our civil and criminal justice system to an almost total impasse.

## B. The Court Cannot Conclude that the Board of Commissioners Lacked Authority To Accept The Consent Decree

Plaintiffs also argue that, in the absence of a finding or a stipulation that Cleveland bounty's election plan violated Section 2 of the Voting Rights Act, any change to the election plan for the county must have been based on authority found in state law. It is Plaintiffs' theory that Sections 153A–58 through 153A–64 of the General Statutes of North Carolina provide the only means by which a North Carolina county commission can alter the structure of a board of commissioners. Plaintiffs claim specifically that "under this statute, the number, term and mode of election can be modified only be referendum." Plt. Motion for Summary Judgment, page 7. Since there was no referendum prior to settling the *Campbell* Case, Plaintiffs claim that the Consent Decree was approved by the Board of Commissioners without proper authorization. Defendant Board of Commissioners disputed Plaintiffs' theory of

tion granted, —— U.S. ——, 117 S.Ct. 761, 136 L.Ed.2d 709 (1997). In *Scott,* the three-judge panel opined that a trial court "may exercise authority under the Fourteenth Amendment if, after a careful evaluation of the terms of the proposed resolution and the details of the underlying dispute, the court concludes the case presents a sufficient evidentiary and legal basis to warrant the bona fide intervention of a federal court into matters typically reserved to a state. In that circumstance [the parties] may propose a resolution to this action without a dispositive, specific determination of the controlling constitutional issue."

8. The Fourth Circuit considered the issue in the context of a challenge to the manner in which a district court implemented a consent decree creating a new electoral system for the Town of Blackstone, Virginia. *Neal v. Harris,* 837 F.2d 632 (4th Cir.1987). The court upheld the consent decree in *Neal* and noted in a footnote that "consent judgments, no less than contested judgments, require the protections of repose to guard, inter alia, against debilitating inconsistencies of results." *Id.* at 634 n*.

North Carolina law and argue that "the referendum procedure [for changing a county's election method] is rarely used and most of the 100 county boards of commissioners in the state use elected methods adopted by other means." Brief of Defendant Board of Commissioners Opposing Plaintiffs' Motion for Summary Judgment, page 7.

■ It would not be appropriate for this Court to make a ruling as to whether the Board of Commissioners violated North Carolina election law on such an issue, when the factual and legal predicates for any such ruling are not a part of the record. Since any dispute of fact would preclude this Court from ruling on this case, the Court finds it is not in a position to rule on this issue without a more adequate record. The Court will not decide this issue without a thorough research of the facts and law based on valuable input from counsel for all parties. The Court does find from the limited record before it there was no facial violation of North Carolina election law in the settling of the *Campbell Case.*

It is undisputed that, as a matter of general local government law, counties may settle lawsuits through consent decrees or by any other means. The inherent power to settle lawsuits has been recognized by the 4th Circuit in a case that remains controlling: "Again, the power to sue and to defend suits carries with it, by necessary implication, the power to make bona fide compromise adjustments of such suits." *Board of Commissioners v. Tollman,* 145 F. 753, 772 (4th Cir.1906)(upholding authority of Onslow County, North Carolina, Board of Commissioners to settle lawsuits concerning railroad stock).

The Court also understands that limited voting is used in elections for several boards of county commissioners other than Cleveland, and has several times been approved by

the North Carolina General Assembly. In *Moore,* the court held that the county commissioners had authority to settle a voting rights case by adopting a limited voting plan. The court rejected arguments that the election method was contrary to state law.[9]

On the basis of the record before it, the Court cannot conclude that the Board of Commissioners lacked authority to approve the Consent Decree.[10] The Court also finds that it had the authority to enter the Consent Decree.

### III. Constitutional Challenges to the Consent Decree

Plaintiffs argue that *Shaw* I and II are the controlling precedents for this case. Plaintiffs contend that the Equal Protection Clause of the Fourteenth Amendment along with controlling legal precedent require that the Election Plan must be subjected to strict scrutiny. To survive strict scrutiny, the Election Plan must be narrowly tailored to serve a compelling government interest. *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Shaw* I; *Shaw* II; *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). Plaintiffs argue that the Election Plan failed strict scrutiny.

### A. Plaintiffs Cannot Show That the Election Plan Must Be Subjected to Strict Scrutiny Under the Equal Protection Clause of the Constitution

■ In order to trigger strict scrutiny in a *Shaw* type case, a plaintiff must show that race was the "predominant factor" motivating the configuration of a particular district such that the challenged redistricting plan "subordinated [to race] traditional race-neutral districting principles," such as compactness, contiguity, respect for political subdivi-

---

**9.** As the 4th Circuit stated: "Finally, the Board contends that the district court should not order limited voting because it is contrary to the public policy of North Carolina. However, four jurisdictions in North Carolina have used limited voting in consent decrees (Bladen County, Clinton City Board of Education, the Sampson County Board of Education, and the Town of Benson). The partial limited voting scheme in Bladen

County was approved by the state legislature." *Id.* at 164.

**10.** It is to be noted that while Plaintiffs claim the Consent Decree violates North Carolina law, no North Carolina official with authority to enforce North Carolina law has taken any action to have that issue appropriately adjudicated.

sions, or "communities defined by actual shared interests." *Miller v. Johnson*, 515 U.S. 900, ——, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995).

Plaintiffs overstate the holdings of *Shaw* I and II when they argue that race must, of necessity, be the "predominant factor" for any settlement of a case under Section 2 of the Voting Rights Act. The *Shaw* cases apply principally to redistricting cases, when "redistricting legislation . . . is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles." *Shaw* I, 509 U.S. at 642, 113 S.Ct. at 2824. The Consent Decree did not involve any redistricting within Cleveland County, so *Shaw* I and II are not directly on point.

■ While the Election Plan was certainly race-conscious, race-consciousness alone does not necessarily trigger strict scrutiny. The Supreme Court has recognized that local governments could validly "attempt to prevent racial minorities from being repeatedly outvoted" by adopting methods to afford fair representation, so long as sound non-discriminatory principles were used to implement those methods. *Shaw* I, 509 U.S. at 651, 113 S.Ct at 2829 (quoting *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 168, 97 S.Ct. 996, 1011, 51 L.Ed.2d 229 (1977)). It is the classification of individuals on the basis of race, not the mere motivation to facilitate equal opportunity for representatives of all races, that requires heightened scrutiny. *Shaw* I, 509 U.S. at 649–52, 113 S.Ct. at 2828–29.

■ The Consent Decree does not contemplate any racial classifications among voters. It does not separate voters or distinguish among voters or candidates along racial lines. It treats all voters in the county—black or white—in precisely the same way. Voting occurs county-wide, with no separation of candidates or voters, geographic or otherwise, and each voter has the same number of votes.

The fact that limited voting provides a greater opportunity to elect minority candidates more readily does not render this election feature constitutionally suspect. A limited voting plan is not an unusual voting procedure at odds with traditional principles of voting.[11]

In sum, the limited voting plan in the Consent Decree is constitutionally permissible. It does not guarantee any seats on the Board of Commissioners to blacks, nor does it give black voters any more voting power than other voters.

■ While the provision of the Consent Decree calling for the appointment of two additional commissioners "representative of the black community" has certain racial overtones, that provision is not a sufficient basis for concluding that the Consent Decree in its entirety should be subject to strict scrutiny. The provision is strictly an interim measure to facilitate the agreement to adopt a permanent racially neutral election process. It does not require on its face that any black commissioners be appointed. The Election Plan requires that, if the two appointed commissioners choose to seek a full term on the Board of Commissioners, they must run for election on an equal basis with all other candidates in 1998.[12]

11. As *Moore v. Beaufort County, N.C.* made clear, the Fourth Circuit has recognized at least four consent decrees entered in settlement of voting rights disputes in North Carolina that have incorporated limited voting. 936 F.2d at 164. Limited voting has also been approved by courts in many other states, including Pennsylvania, Connecticut and Alabama. *See, e.g., Kaelin v. Warden,* 334 F.Supp. 602 (E.D.Pa.1971); *LoFrisco v. Schaffer,* 341 F.Supp. 743 (D.Conn.), *aff'd,* 409 U.S. 972, 93 S.Ct. 313, 34 L.Ed.2d 236 (1972); *Orloski v. Davis,* 564 F.Supp. 526 (M.D.Pa.1983); *Dillard v. Town of Cuba,* 708 F.Supp. 1244 (M.D.Ala.1988). In fact, limited voting is a long-recognized method of ameliorating any consis-

tent lack of minority representation. *See* Richard L. Engstrom, *Modified Multi–Seat Election Systems as Remedies for Minority Vote Dilution,* 31 STETSON L.REV. 743,758–60 (1992); Joseph F. Zimmerman, *The Federal Voting Rights Act and Alternative Election Systems,* 19 WM. & MARY L.REV. 621, 652–54 (1978).

12. Plaintiffs also raise a Fifteenth Amendment claim with respect to the appointment of the two Commissioners, inferentially claiming that the appointment violated their right to vote, on account of race. Second Amended Complain, ¶ 28. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall

The Court is reluctant to tinker with the Consent Decree. The Consent Decree was only arrived at after extraordinary negotiations by the parties and the Mediator. When the Court queried the parties during oral argument as to whether a modification of the Consent Decree to deal with the interim appointment of commissioners would be an acceptable compromise, counsel for Plaintiffs and Defendant Board of Commissioners each declined to agree to any modification of the Consent Decree, stating that his client wanted the Consent Decree to be upheld or vacated in its entirety.[13]

### B. The Court Does Not Reach Analysis Under Strict Scrutiny

The Consent Decree, when viewed as a whole, is not a race-based measure subject to strict scrutiny, so the Court does not reach the issue of whether the election plan is narrowly tailored to serve a compelling government interest. The Consent Decree is constitutionally permissible.

### CONCLUSION

Plaintiffs' Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment will be denied. Defendants' motion to dismiss will be granted. An appropriate order is attached hereto.

### *ORDER*

This matter is before the Court on (1) Plaintiffs' Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment; (2) Defendant Cleveland County Board of Commissioners' Motion to Dismiss; and (3) Defendant National Association for the Advancement of Colored People's Motion to Dismiss. For the reasons cited in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' motion is denied; and it is

not be denied or abridged by the United States or any State on account of race, color, or previous condition of servitude." There is no Fifteenth Amendment violation in this case. This case does not involve a Fifteenth Amendment issue.

**FURTHER ORDERED** that Defendants' motion is granted.

---

**13.** Counsel for Plaintiffs likewise said his client would not be placated by a decision that would only read out of the Consent Decree the interim "appointment" aspect.