**PARALYZED VETERANS OF AMERICA, INC., et al.,
Appellants,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
et al., Appellees.**

**No. 88–5413.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1989.

Decided Jan. 30, 1990.

Matthew J. Seiden, with whom Peggy L. Twohig, Washington, D.C., was on the brief, for appellants. Richard J. Wertheimer, Washington, D.C., also entered an appearance for appellants.

Mark R. Pohl, with whom Gerard J. Stief, Robert J. Kniaz and Robert L. Polk, were on the brief, Washington, D.C., for appellee, Washington Metropolitan Area Transp. Authority.

Before EDWARDS, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

The plaintiff-appellants and the Washington Metropolitan Area Transit Authority ("WMATA") dispute the meaning of the following clause in a consent decree agreed on by them in 1978:

WMATA will install and make operational, prior to the commercial operation of each Metrorail station, at least one eleva-tor access from the surface level at the station.

*Paralyzed Veterans of America, Inc. v. WMATA,* No. 776–72, ¶ 1, at 2, Joint Appendix ("J.A.") 29, 30 (D.D.C. September 27, 1978) (Final Consent Order and Dismissal) ("Consent Decree"). The appellants, Paralyzed Veterans of America, the Spinal Cord Injury Network of Metropolitan Washington, and Richard Heddinger, read the clause to impose on WMATA a continuing duty to maintain all elevators in the Metro system. They do not specify the maintenance standard, but contend that present conditions, evidently involving frequent breakdowns and extended periods out of service, represent a violation. WMATA claims the clause requires simply that it have at least one elevator operational at each station when it opens. (No one suggests that WMATA has in any instance jerryrigged an elevator just to have it operational on a station's opening day, and we do not address application of the decree to such behavior.) The district court below agreed with WMATA's reading and we affirm. Of course this decision does not foreclose any other avenues of relief available to the plaintiffs on their claims that WMATA is not properly maintaining its elevators.

Appellants originally sued in 1972 to compel WMATA to comply with the terms of the Architectural Barriers Act, 42 U.S.C. §§ 4151–57 (1982) ("ABA"). Appellants' Brief at 1. In October 1973 they won an injunction that prohibited WMATA "from commercially operating any station of the Metro railway transportation system until [WMATA] installs and makes operational all those facilities including elevators, as may be necessary to ensure that physically handicapped persons will have ready access to, and use of, such Metro railway system station." Order of Final Judgment, October 23, 1973, J.A. 5 ("1973 Order"). Litigation continued over the next several years, however, as the plaintiffs and WMATA battled over exactly what facilities this injunction required. See, e.g., Memorandum in Support of Plaintiffs' Motion to Clarify the Court's Order of October 24, 1973,

April 30, 1976, J.A. 11 (arguing that the 1973 Order requires WMATA to install additional elevators at Gallery Place station).

In 1978 the district court ordered the parties to begin settlement negotiations to resolve the remaining disputes. See Order, February 15, 1978, J.A. 23. The negotiations bore fruit several months later in the form of the Consent Decree. It settled the debate about what facilities would satisfy the 1973 Order with specific provisions governing each type of facility—elevators, fare card processors, service gates, buses, and wheelchair-accessible paths. For elevators it set a minimum of one, with additional requirements at a few specified stations. Ten years later, the appellants commenced these proceedings, contending that persistent elevator breakdowns demonstrated that WMATA was violating the Decree "by failing to provide access to Metro by operational elevators." See Plaintiffs' Motion to Reopen Proceedings and Obtain Other Relief, J.A. 34, 35. The district court denied the motion, ruling that the Consent Decree "does not mandate the level of efficiency at which WMATA is required to operate each elevator," and that it may not be construed "to commission the court to maintain oversight over the continued serviceability of elevators once installed and operational." See *Paralyzed Veterans of America, Inc. v. WMATA*, No. 776–72–LFO, order at 3, J.A. 1, 3, 1988 WL 113825 (D.D.C. Oct. 19, 1988).

■ Under circuit law we treat construction of a consent decree as a matter of contract law, see *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1125 (D.C.Cir.1983), and review it *de novo*, without deference to the interpretation of the district court, *United States v. Western Electric Co., Inc.*, 797 F.2d 1082, 1089 (D.C.Cir.1986); see also *United States v. Western Electric Co., Inc.*, 846 F.2d 1422, 1427 (D.C.Cir.1988) (applying *de novo* standard of review). WMATA argues that we should adopt the view taken by the Sixth Circuit and defer to the district judge's interpretation because of his experience in the litigation. *Brown v. Neeb*, 644 F.2d 551, 558 n. 12 (6th Cir.1981). See also

*Vertex Distributing v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 893 (9th Cir.1982) (relying on *Brown* ); WMATA Brief at 26. This argument seems foreclosed by circuit law but as we agree entirely with the district court, there is no need to explore the issue.

■ Appellants would find a duty of continuing maintenance in the Decree's requirement that WMATA "make operational . . . at least one elevator access," arguing that "access" connotes a continuing condition and reading the clause "prior to the commercial operation" as merely defining the starting date. Appellants' Brief at 10–12.

The most obvious flaw in the argument is that no word of the Decree ever refers to duties of repair or maintenance, much less sets any kind of standard. The omission is especially telling because maintenance is a subject different not merely in degree but in kind from a one-time duty to "make operational." While it would normally be quite easy for a district judge to monitor a guarantee that an elevator be operational at a single moment (the start of subway operations at a station), continued supervision of the level of repair and maintenance would surely not. It stretches credulity to suppose that the parties could have enlisted him for that purpose, or could even have intended to enlist him, without mentioning repair or maintenance. Indeed, the original complaint in this case makes clear that the scope of the litigation has always been much narrower. The unlawful behavior alleged by the plaintiffs was that "the *construction* of the Metro without adequate provision for the physically handicapped violates the requirements of [the ABA]." Complaint, April 19, 1972, at 2 (emphasis added). The relief requested was equally narrow, asking the court to order WMATA to "comply with the aforesaid Acts of Congress and [to] *install* elevator transport systems in every station in order to make the Metro readily accessible to the physically handicapped." *Id.* at 7 (emphasis added). Never was maintenance mentioned.

The appellants further argue that if the Decree means only what the district court

held, "it would have accomplished no purpose, except to relieve WMATA of any meaningful obligation to its mobility-impaired riders." Appellants' Brief at 17. Appellants' premise here is that the 1973 injunction already imposed ongoing maintenance duties on WMATA. We can find no support for this view. The injunction itself, quoted at 459 above, lacks any reference to repair or maintenance, or to keeping elevators operational, just as does the Consent Decree itself. In support of their theory, appellants point us to an observation by the district court made in denying a motion by an intervenor to modify the 1973 injunction:

> Plaintiff-intervenor's argument that a building, which has been designed and constructed for access by, but incapable of use by, handicapped persons, does not violate the [Architectural Barriers] Act effectively stands the Act on its head. No matter how "simple" and "straightforward" the Act was intended to be, it was also intended to insure "ready access to, *and use of,*" defendant's buildings and structures. If the statute is not to be bereft of its very purpose, those words must clearly mean that required facilities for the handicapped be operative, not merely in the process of installation.

Memorandum and Order, August 31, 1976, at 3 n. 1, J.A. 16, 18 (emphasis in original).

These words do not construe the injunction as creating a maintenance duty. No issue remotely approaching that was before the court. The moving party was a group of downtown businesses who in 1976 asked for special relief as to the Gallery Place station. No elevator had been installed, and installation was not expected until April 1977. The intervenor objected to precisely the delay that the injunction mandated, which gave a competitive advantage to downtown businesses close to the Metro Center station, two blocks away. *Id.* at 3–4. The court's assertion that the facilities "be operative, not merely in the process of installation" simply rejects the intervenor's claim that lawful design, plus ongoing (lawful) construction, was enough.

No consideration of possible ongoing maintenance duties was in order.

Alternatively, appellant's notion that the district court's reading of the Decree would "relieve WMATA of any meaningful obligation to its mobility-impaired riders" may depend on a very broad reading of its preclusion clause. That clause says only that the Decree "precludes any other action against WMATA based upon allegations that the Metrorail *facilities presently [1978] in operation are* not in compliance with the existing Architectural Barriers Act ... and existing regulations promulgated pursuant thereto." Consent Decree at 1–2 (emphasis added). It seems strange to read this as having any bearing on later maintenance problems. Just as the Decree appears directed at expressing *construction* duties for WMATA, the preclusion clause seems primarily directed at relieving it of litigation hazards arising from any past defaults in construction. It does not appear to bear on maintenance issues, and certainly not on ones occurring after the Decree. Any such claims, whether arising from the Architectural Barriers Act or any other source of law, remain available.

We do not pass on whether the Architectural Barriers Act creates any duty of maintenance. Each of its substantive sections requires some agency or official to prescribe "standards for the design, construction, and alteration [of affected buildings, structures or facilities] to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings." 42 U.S.C. §§ 4152–54a. Plaintiffs argue that to accomplish the act's *purpose* of assuring access, it must be read to create obligations outside the realm of "design, construction, and alteration." But the answer to this question seems unhelpful to resolution of this case. The Supreme Court has taken the view that consent decrees "should be construed basically as contracts, without reference to the legislation the [plaintiffs] originally sought to enforce." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43

L.Ed.2d 148 (1975). Even if we read this as undermined by the Court's statement a few lines later that courts may read a consent decree in light of "the circumstances surrounding the formation of the consent order," *id.* at 238, 95 S.Ct. at 935, it does not change matters. If the Act creates implied duties of maintenance, the Consent Decree left plaintiffs free to enforce them; plaintiffs point us to nothing suggesting that such issues were on the table when the Decree was negotiated. If the Act created no ongoing maintenance duties, then it is puzzling why WMATA would have taken them on board in the Decree.

Accordingly, we affirm the district court's order denying plaintiffs' motion to reopen the case, without prejudice to their rights to seek any relief otherwise available to them for WMATA's alleged non-maintenance or non-repair of its station elevators.

*So ordered.*