CLEVELAND COUNTY ASSOCIATION FOR GOVERNMENT BY THE PEOPLE, An Unincorporated Association, et al., Appellants,

v.

CLEVELAND COUNTY BOARD OF COMMISSIONERS, et al., Appellees.

United States of America, Amicus Curiae.

No. 97–7097.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1998.

Decided May 1, 1998.

Robinson O. Everett, Washington, DC, and Neil C. Williams, III argued the cause and filed the briefs for appellants.

Kevin J. Lanigan, Washington, DC, argued the cause for appellee National Association for the Advancement of Colored People, with whom Sarah L. Kinnick, Denver, CO, was on the brief.

Michael Crowell, Raleigh, NC, argued the cause for appellee Cleveland County Board of Commissioners, with whom E. Hardy Lewis, Raleigh, NC, was on the brief.

Bill Lann Lee, Acting Assistant Attorney General, United States Department of Justice, Mark L. Gross, and Michelle M. Aronowitz, Washington, DC, Attorneys, were on the brief for amicus curiae United States.

Harvey L. Pitt and Douglas W. Baruch, Washington, DC, were on the brief for amicus curiae Harvey L. Pitt.

Before: EDWARDS, Chief Judge, WALD and GINSBURG, Circuit Judges.

PER CURIAM:

As part of the settlement of a suit brought by the National Association for the Advancement of Colored People ("the NAACP") that challenged the method of voting for members of the Board of Commissioners of Cleveland County, North Carolina ("the Board"), the Board agreed to adopt a plan that increased its size from five to seven members and provided that voters would be permitted to cast only four votes for the seven positions. The settlement further provided that until elections could be held to fill the two additional slots, these positions would be filled by appointees who were "representative of the black community" in the county. Soon after the district court issued a consent decree incorporating the parties' agreement, the Cleveland County Association for Government by the People, an unincorporated association of voters in the county, and six individual plaintiffs, all of whom are white (collectively, "the CCAGP"), brought suit against the Board and the NAACP, challenging the adoption of the plan as a violation of their constitutional rights and as contrary to state law. The district court, finding none of their challenges to be meritorious, granted summary judgment in favor of the defendants. We conclude, however, that the Board was without authority

under state law to consent to such a change in the election plan, and thus we vacate the decree. Because the decree was invalid under state law, we need not reach the CCAGP's constitutional claims.

## I. BACKGROUND

From 1966 to 1994, the Board consisted of five members elected at large every two years for staggered, four-year terms. During that time, no African Americans had ever been elected to the Board although they constituted 20.9 percent of the county's total population and 18.8 percent of its voting age population in 1990. Between 1988 and 1994, there had been attempts by five African Americans, all Democrats, to win a seat on the Board, but none survived the primary elections.

After the local chapter of the NAACP approached the Board with concerns that the at-large method of election thwarted the representation of African Americans on the Board, the Board voted on March 16, 1992, to establish the Special Commissioners Committee on County Governance ("the Committee"), which consisted of five members appointed by the Board and four members from the local NAACP chapter. On November 2, 1992, the Committee recommended the adoption of a new election method in which five commissioners would be elected from single-member districts and two commissioners would be elected from the county at large. The Committee also recommended consideration of three redistricting plans, each of which contained a majority-minority district. The Board voted to accept these recommendations and requested that the members of the General Assembly representing Cleveland County introduce legislation authorizing a change in the election method and permitting the Board to select a redistricting plan. Chapter 89 of the North Carolina Session Laws of 1993, which authorized these changes, was ratified on June 1, 1993, although it expired by its own terms in January 1994 when the Board was unable to agree on a redistricting plan.[1]

The NAACP and several individual plaintiffs thereafter filed suit against the Board, challenging the county's at-large electoral system. On July 22, 1994, after mediation, the Board and the NAACP entered into a consent decree, signed by the district court below,[2] which instituted two primary changes in the structure and election of the board: the expansion of the Board from five to seven members, all elected at large, and the adoption of limited voting. *Campbell v. Cleveland County Bd. of Comm'rs*, No. 94-0845-S (D.D.C. July 22, 1994). Beginning in 1998, the entire seven-member Board would be elected for concurrent four-year terms in partisan primary and general elections, with each voter to be allocated only four votes in each election. After the 1998 election, the district court would be permitted, on the NAACP's petition, to reduce from four to three the number of votes that could be cast by each voter if the election system used in 1998 had not "provided an equal opportunity, based on the totality of the circumstances, for black citizens to nominate and elect candidates of their choice." (The Board could effect a similar reduction on its own by adoption of a resolution.[3])

1. On October 5, 1993, a motion to proceed with one of the recommended redistricting plans failed by a vote of two to three.

2. The suit had originally been filed in North Carolina, but because it concluded that the Board was raising a constitutional challenge to the Voting Rights Act as a defense, the district court in North Carolina, relying on 42 U.S.C. § 1973*l* (1994), transferred the suit to the U.S. District Court for the District of Columbia.

3. On February 4, 1998, the district court ordered, on the joint motion of the NAACP and the Board, a modification to the consent decree that staggers the terms of the seven-member Board while maintaining limited voting (*i.e.*, two votes for either three or four seats). The modification also provides that following the 2000 election and prior to July 1, 2001, any registered voter may petition the court to reduce from four to three the number of votes that may be cast over a four-year election cycle; in determining whether to grant the petition, the court will consider "whether the election method used in 1998 and 2000 has provided an equal opportunity, based on the totality of the circumstances, for all citizens to nominate and elect candidates of their choice without regard to race." *Campbell v. Cleveland County Bd. of Comm'rs*, No. 94-0845-S (Feb. 4, 1998).

The decree also established an interim policy for the period between the adoption of the consent decree and the 1998 elections. Of the original five members, the two elected in 1994 would serve four-year terms, as previously scheduled, and the three elected in 1996 would serve only two-year terms. The two new positions, however, were to be filled after the 1994 election by the appointment of two persons who were "representative of the black community in Cleveland County"; these officials were to be selected from a list, created by the Board, of those citizens who it felt met that criterion. The NAACP was permitted to review this list and voice its objections to any person included. If the Board ultimately selected someone to whom the NAACP had objected, the Board's decision was subject to judicial review; otherwise, the Board's selections were final. The plan was precleared under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1994), by the U.S. Attorney General on September 26, 1994.

Pursuant to the consent decree, the Board developed a list of twenty-two potential candidates, all of whom were African American, for the two newly created positions and, after submitting it to the NAACP, selected two members from the list. The NAACP had objected to both, and the district court, exercising its review authority under the consent decree, approved the appointment of Bobby C. Malloy but rejected the other candidate. The Board then appointed Mary Accor to the remaining position; both Malloy and Accor are now serving as members of the Board.

On January 6, 1995, the CCAGP filed suit against the Board to challenge the election plan, alleging that because the two new members of the Board were to be appointed on the basis of their race and because subsequent elections of Board members were to be conducted in a race-based manner, the plan violated the CCAGP's rights under the Fourteenth and Fifteenth Amendments and the North Carolina Constitution.[4] On February 18, 1997, the district court denied the CCAGP's motion for judgment on the pleadings and ordered that the NAACP, as a party to the consent decree, be added as a defendant.[5] After filing an amended complaint,[6] the CCAGP renewed its motion for judgment on the pleadings or, in the alternative, for summary judgment; both the Board and the NAACP filed motions to dismiss. On May 19, 1997, the district court denied the CCAGP's motion and granted summary judgment in favor of the Board and the NAACP. *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs* [hereinafter *CCAGP*], 965 F.Supp. 72 (D.D.C.1997). The court first concluded that the CCAGP had standing to bring the action, noting that "[t]hey are registered voters and citizens of Cleveland County bringing an action concerning an alleged violation of the Equal Protection Clause with respect to the election procedures used in their county." *Id.* at 76. It also rejected the NAACP's argument that the plaintiffs were estopped from bringing the action because their interests were adequately represented in *Campbell*, concluding that the CCAGP's interests and those of Cleveland County "arguably are materially different." *Id.* at 77.

Having found standing on the part of the CCAGP to challenge the consent decree, the court next considered its attack on that decree. The court first concluded that, con-

---

**4.** The CCAGP filed an amended complaint on September 21, 1995, to eliminate the Cleveland County Board of Elections, its members, its supervisor, and Julian B. Wray, Cleveland County Attorney, as defendants and to update the chronology of the case. As the district court noted, CCAGP's late involvement in these proceedings was due to the fact that "there were no public hearings on the Consent Decree prior to its acceptance by the Board of Commissioners and little publicity was given to the case within Cleveland County." *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 965 F.Supp. 72, 77 (D.D.C.1997).

**5.** The CCAGP had originally filed in the Western District of North Carolina, but the court there transferred the case on June 5, 1996, to the district court below, concluding that "the interest in judicial economy" dictated that the same court that had entered the consent decree hear the CCAGP's challenge to it.

**6.** The amended complaint alleged violations of the CCAGP's Fourteenth and Fifteenth Amendment rights, its due process rights, violations of North Carolina law, and its rights under Article I, sections 19 and 32, of the North Carolina Constitution.

trary to the CCAGP's assertion, it was unnecessary to find a violation of section 2 of the Voting Rights Act before it entered the decree, noting that if courts were required to find violations before entering decrees, parties would have little incentive to settle claims. *Id.* at 78. Next, the court concluded that the Board was not barred by state law from entering the agreement, concluding that "counties may settle lawsuits through consent decrees or by any other means" and that limited voting had been approved several times by the North Carolina General Assembly. *Id.* at 79.

Finally, the district court addressed the CCAGP's constitutional arguments. It rejected the claim that the election plan triggered strict scrutiny, noting that "[t]he Consent Decree does not contemplate any racial classification among voters.... It does not guarantee any seats on the Board of Commissioners to blacks, nor does it give black voters any more voting power than other voters." *Id.* at 80. With respect to the interim appointment of two additional Board members who are "representative of the black community," the court noted that although the provision "ha[d] certain racial overtones," it was not sufficient to subject the consent decree as a whole to strict scrutiny. "The provision is strictly an interim measure to facilitate the agreement to adopt a permanent racially neutral election process," it concluded. "It does not require on its face that any black commissioners be appointed." *Id.* The court thus declined to vacate the decree and granted the motions of the Board and the NAACP.[7] The CCAGP's appeal followed.

## II. ANALYSIS

### A. *The CCAGP's Standing to Challenge the Consent Decree*

■ Before we proceed to the merits of the CCAGP's complaint, we must, as did the district court, determine whether the CCAGP has standing to challenge the consent decree. Despite the exhortation of the NAACP to the contrary, we find that the hurdle of standing in this case has been surmounted.

■ In order to establish standing under Article III, a complainant must allege (1) a personal "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) a causal connection between the injury and the conduct complained of, and (3) that it is "likely," rather than merely "speculative," that the injury will be redressed by the relief requested. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992); *Branton v. FCC,* 993 F.2d 906, 908 (D.C.Cir.1993). The NAACP's challenge focuses on the first of these requirements: namely, it contends that the CCAGP has failed to show that it has suffered any injury as a result of the implementation of the election plan in the consent decree. According to the NAACP, the CCAGP's opposition to the consent decree is nothing more than a generalized grievance, an "abstract injury in nonobservance of the Constitution" rather than the "particularized" injury necessary to confer standing. *See, e.g., Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984) (asserted right to have the government "act in accordance with law" not sufficient to confer standing).

We are not persuaded by the NAACP's arguments. The CCAGP has put forward a claim that as a result of the consent decree, its members have been denied the opportunity to vote for a full slate of the elected officials of their choice—officials who would thereafter be deemed to represent them.[8]

---

7. Although the Board's and the NAACP's motion were styled as motions to dismiss, the district court's consideration of materials outside the CCAGP's pleadings transformed those motions, as well as the CCAGP's motion, into motions for summary judgment. *See* FED R.CIV.P. 12(b) ("If, on a motion asserting the defense [of failure to state a claim upon which relief can be granted], matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...."); FED.R.CIV.P. 12(c) (same as to motion for judgment on the pleadings).

8. This harm is arguably made more palpable by the fact that the two appointees to the Board were required to be "representative of the black community." On its face this prerequisite does not narrow the scope of these members' representation; however, when a representative office

Like plaintiffs who reside in a district that is the subject of a racial gerrymander challenge, *see, e.g., United States v. Hays*, 515 U.S. 737, 744–45, 115 S.Ct. 2431, 2435–36, 132 L.Ed.2d 635 (1995), the CCAGP asserts that the election procedure adopted by its local legislature has violated its members' protected voting rights. This alleged injury is certainly sufficient to grant standing—indeed, it is akin to the injury to voting rights claimed by the plaintiffs in *Campbell* that engendered the current controversy. It would be anomalous for us to assume that the *Campbell* plaintiffs had standing to challenge the county's method of voting but to hold that the CCAGP does not.[9]

■ It is important to recognize that standing is a threshold inquiry; it " 'in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975)). Thus, whether the CCAGP ultimately succeeds on its constitutional and state law claims is of no import to the standing analysis. What is important is whether the CCAGP[10] has succeeded in establishing the presence of a case or controversy, and it has surely met this burden here.

## B. The CCAGP's Representation Below

■ In its second procedural challenge, the NAACP renews its argument, rejected by the district court, that the CCAGP and its members are precluded from challenging the consent decree because, as citizens and voters in the county, they were adequately represented in the *Campbell* litigation by the Board, which is composed of their own elected officials. Here, again, we agree with the district court.

In general, "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 2184–85, 104 L.Ed.2d 835 (1989). This rule is merely, as the Supreme Court has noted, a necessary corollary to the oft-stated principle that " 'everyone should have his own day in court.'" *Id.* (quoting 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449 (1981)). Thus, unless one is joined as a party to an action, one is generally not bound by the result, no matter whether that

"obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 648, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993).

9. The remaining two prongs of the standing inquiry warrant little discussion; indeed, the NAACP has not presented a challenge pursuant to either of them. The "causation" analysis ensures that the alleged injury is "fairly traceable" to the actions of the defendant rather than to the actions of an absent third party. *See, e.g., Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. The "redressability" inquiry determines whether the relief sought, if granted, would remedy the alleged injury. *Id.* at 561, 112 S.Ct. at 2136–37. Because the consent decree is the source of the county's new election plan, which, in turn, is the source of the CCAGP's grievance, the vacating of the decree will provide adequate relief for the CCAGP's injury. We are thus satisfied that the CCAGP has standing to bring this case.

10. We recognize that although the term "CCAGP," as we have used it thus far, comprises both the Cleveland County Association for Government by the People and the individual plaintiffs, the standing of the former, as an association, is subject to a separate analysis. In order for the CCAGP to have standing, it must satisfy a three-part test: (1) its members would have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose; and (3) its claim and requested relief do not require participation by individual members. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). All three requirements are satisfied in this case. First, as the CCAGP is an association of county voters, its members could and, indeed, have brought suit individually. Second, the interest CCAGP seeks to protect—a lawful method of electing the Board in Cleveland County—is germane to its purpose, which is "that the electoral process in Cleveland County is not manipulated to achieve unconstitutional objectives and that this electoral process is not distorted in an unconstitutional, race-based manner." And, finally, the participation of individual members is not required to assert this claim or to obtain the relief requested.

result is reached voluntarily by the parties or imposed upon them by the court. *Id.* at 765, 768, 109 S.Ct. at 2186, 2187–88.

This does not mean, however, that a noninterested plaintiff may seek relitigation of a dispute between two parties simply because he disagrees with the outcome. As we have previously noted, *Martin v. Wilks* stands for the proposition that "[o]ne may challenge a judgment rendered in one's absence if (and only if) it affects one's legal right." *Frederick County Fruit Growers Ass'n v. Martin,* 968 F.2d 1265, 1270 (D.C.Cir.1992). And one may not bring such a challenge "when, in certain limited circumstances, [he,] although not a party, has his interests adequately represented by someone with the same interests who is a party." *Wilks,* 490 U.S. at 762 n. 2, 109 S.Ct. at 2184–85 n. 2 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (class action suits); *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (control of litigation on behalf of one of the parties)). Our resolution of the standing dispute obviates a rehearsal of the first point: the CCAGP and the individual plaintiffs clearly have asserted that the consent decree has inflicted an injury to their legal rights. As to the second point, we agree with the district court and conclude that the Board was not a sufficient representative of the CCAGP in *Campbell.*

As the district court noted, *CCAGP,* 965 F.Supp. at 77, the facts of this case are similar to those of *Meek v. Metropolitan Dade County, Fla.,* 985 F.2d 1471 (11th Cir. 1993). In *Meek,* the district court had denied intervention to a group of registered voters for purposes of appeal of a Voting Rights Act case because it deemed the interests of the movants to be identical to those of the defendant county commissioners. The Eleventh Circuit reversed the denial, concluding that the interests of the two parties were indeed different:

> The intervenors sought to advance their own interests in achieving the greatest possible participation in the political process. Dade County, on the other hand, was required to balance a range of inter-

ests likely to diverge from those of the intervenors. For example, the County Commissioners had to consider the overall fairness of the election system to be employed in the future, the expense of litigation to defend the existing system, and the social and political divisiveness of the election issue. In addition, the County Commissioners were likely to be influenced by their own desires to remain politically popular and effective leaders.

*Id.* at 1478. The interests of the Board in this case and the CCAGP are similarly divergent. The Board, in negotiating the consent decree, was seeking to resolve a dispute over what had been challenged as an unlawful method of electing its members. It can therefore be presumed that the peaceful resolution of the dispute—and the preservation of the commissioners' positions, to the extent possible—were not insignificant considerations. The CCAGP, by contrast, is not motivated by the need to save the Board from protracted litigation; indeed, it seeks an election plan devised free from that constraint. The interests of the Board and the CCAGP cannot therefore be deemed to have been aligned such that the CCAGP is precluded from challenging the consent decree. The fact that the members of the previous Board were the CCAGP's elected representatives is of no moment, for those commissioners were equally the representatives of all county citizens—including their opponents in *Campbell.* It cannot be said, therefore, that the Board functioned as an adequate representative of the CCAGP's interests. *Cf. Rafferty v. City of Youngstown,* 54 F.3d 278, 282 (6th Cir. 1995) (plaintiffs precluded from challenging consent decree because their collective bargaining representative was defendant-intervenor in underlying case). As the CCAGP notes, if elected officials were deemed always to be representative of their constituents in the sense contemplated by footnote two of *Wilks,* consent decrees to which the government was a party would be immune from challenge regardless of their effect on individual rights. We decline to reach such a conclusion.[11]

11. The Supreme Court has not yet decided "whether public officials are always constitution-

ally adequate representatives of all persons over whom they have jurisdiction when ... the under-

### C. *Mootness*

 As a last jurisdictional parry, the Board, the NAACP, and the United States as *amicus curiae* argue that the CCAGP's challenge to the interim appointment provisions is moot because the 1998 campaigns for these two seats have already begun. In other words, the parties contend, the only remedy we could order would be to open these positions to election, and this process is already under way. We find no merit to these claims. A question is moot only if "intervening events make it impossible to grant the prevailing party effective relief." *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C.Cir.1996). This is not the case here. To begin with, the November 1998 elections for the seats now held by appointees have not yet taken place, so there is nothing constituting an "intervening event" that would render the CCAGP's challenge to the appointment provisions moot. *Cf. Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969) (per curiam) (passage of 1968 election made injunctive relief from state residency requirement "impossible to grant"). More important, however, is that because the CCAGP challenges the Board's authority to enter the consent decree at all, a finding in the CCAGP's favor would invalidate the decree and eliminate the authorization for these two positions altogether, returning the structure and manner of election of the Board to the *status quo ante*. The availability of such a remedy means that the CCAGP's challenge to the interim appointments remains a live controversy, and so we reject any arguments to the contrary.

lying right is personal in nature." *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 800–02 n. 6, 116 S.Ct. 1761, 1767 n. 6, 135 L.Ed.2d 76 (1996). *But see Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 263 n. 7, 97 S.Ct. 1047, 1051 n.7, 51 L.Ed.2d 313 (1977) (voting rights challenge by county residents not barred by county's earlier suit); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4458 (1981) ("Voting rights may deserve special protection because they lie so close to the core of democratic government that litigation by public servants should not bind their voting masters.").

### D. *The CCAGP's State Law Claims*

 Having disposed of the preliminary challenges to the CCAGP's presence before this court, we move to the merits. We begin by addressing the CCAGP's assertion that the adoption of the election plan violated state law, for if the resolution of this claim proves dispositive, we need not—and, indeed, should not—reach the CCAGP's constitutional concerns. *See, e.g., National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 353 (D.C.Cir.1997) (noting that "it is a well-established principle that courts should avoid unnecessarily deciding constitutional questions"). We review the district court's grant of summary judgment to the Board and the NAACP *de novo*. *Federal Deposit Ins. Corp. v. Bender*, 127 F.3d 58, 63 (D.C.Cir. 1997). Because no party on appeal contends that there existed any genuine issue of material fact with respect to the state law issue, we need decide only whether the Board and the NAACP were indeed entitled to judgment as a matter of North Carolina law. We conclude that it was, in fact, the CCAGP that was entitled to summary judgment.[12]

 North Carolina law reserves to the state, or to the voters of the county, authority over the structure and method of election of county boards. *See* N.C. Const. art. 7, § 1 ("The General Assembly shall provide for the organization and government ... of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable."); N.C. Gen.Stat. § 163–22.2 (1995) (if form of election of any

12. The NAACP argues that the CCAGP's failure to include with its motion a separate statement of material facts as to which it contended there was no genuine issue, as required by Local Rule 108(h), mandated judgment against the CCAGP. While it is true that the CCAGP failed to comply with Rule 108(h) in this regard, it was within the district court's discretion to consider its motion despite this lapse. *See, e.g., Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C.Cir. 1980) ("The District Court, in its discretion, may consider a motion for summary judgment even in the absence of a proper [Rule 108(h)] Statement."). That discretion was not abused here.

county Board of Commissioners is held invalid by a state or federal court, state Board of Elections has authority to make interim rules and regulations). The benchmark in this regard is established by North Carolina General Statute section 153A–34, which provides that the structure and manner of election of the Board of Commissioners in each county "shall remain as it is on February 1, 1974, until changed in accordance with law." N.C. Gen.Stat. § 153A–34 (1991). Subsequent changes in the structure and election of any board must take place in accordance with a specifically prescribed procedure. First, the Board of Commissioners in a county must initiate any such change by adopting a resolution that describes the proposed alterations and the manner of transition, defines electoral districts, and calls a special referendum on the question of the adoption of the alterations. N.C. Gen. Stat. § 153A–60 (1991).[13] If a majority of the votes cast in the referendum vote are in the negative, the plan may not be put into effect. N.C. Gen. Stat. § 153A–61 (1991). If the plan is approved, it becomes the basis for the nomination and election of the board at the next election and is formally put into place on the first Monday in December after the general election. N.C. Gen. Stat. § 153A–62 (1991). These procedural requirements are accompanied by one substantive criterion relevant here: If commissioners are elected at large rather than by district, the entire board must be nominated and elected by county voters. N.C. Gen. Stat. § 153A–58(3)(a) (1991).[14]

It is undisputed that this statutorily mandated scheme was not followed in this case:

No referendum on the election plan provided for in the consent decree was ever held, and the interim appointment provisions run afoul of section 158A–58(3)(a) by prohibiting the county voters from nominating and electing two of the seven commissioners. Although the district court's call for "a thorough research of the facts and law based on valuable input from counsel for all parties," *CCAGP*, 965 F.Supp. at 79, seems to acknowledge some perplexity on the issue, these provisions of state law appear to us quite clear; indeed, it is we who are perplexed as to the basis on which the district court concluded that "there was no facial violation of North Carolina election law in the settling of [*Campbell*]." *Id.* Read on its face, state law denies the Board the authority unilaterally to alter its structure and manner of election simply by agreeing to do so. *Cf. Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir.1997) (parties to consent decree "could not agree to terms which would exceed their authority and supplant state law"); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) (same). As the Seventh Circuit aptly stated in *Perkins*,

> some rules of law are designed to limit the authority of public officeholders, to make them return to other branches of government or to the voters for permission to engage in certain acts. They may chafe at these restraints and seek to evade them, but they may not do so by agreeing to do something state law forbids.

*Perkins*, 47 F.3d at 216 (citation and internal quotation omitted).[15]

---

**13.** We should note that while section 153A–34 refers to the "structure and manner of election" of a board, section 153A–60, on its face, requires a referendum only for changes in a board's "structure." However, we read "structure" in the latter section to encompass the manner of election as well, given that section 153A–58 provides that "[a] county may alter the structure of its board of commissioners by adopting one or any combination of the options prescribed by this section," options that include changes to the manner of election. *See* N.C. Gen. Stat. § 153A–58 (1991).

**14.** This method of election is one of several options permitted by section 153A–58, but it is the only method permitted when board members are elected at large rather than by district.

**15.** The NAACP and *amici* cite *Lawyer v. Department of Justice*, —— U.S. ——, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997), for the proposition that a government entity's ability to settle litigation supersedes any state law that purports to limit that authority. This is a misreading of *Lawyer*, which held only that the authority generally held by a *state* to make its own redistricting decisions is fully realized when the *state* agrees to a consent decree that includes a redistricting plan. *Id.* at ——, 117 S.Ct. at 2197. Cleveland County, as a legislative unit subordinate to the state of North Carolina, has only the authority that the General Assembly grants it. *See* N.C. Const. art 7, § 1.

The applicability in the abstract of the North Carolina provisions discussed above, however, does not end our inquiry. Rather, these provisions may be superseded in either of two ways: (1) if such supersession is necessary to remedy a violation of federal law or (2) by a local act of the General Assembly (*i.e.*, by special amendment of state law). Because neither of these circumstances is present here, however, the consent decree must comply with state law; as it does not, it must be vacated.

 Pursuant to the Supremacy Clause of Article VI of the U.S. Constitution, state law is preempted when it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Washington Serv. Contractors Coalition v. District of Columbia*, 54 F.3d 811, 815 (D.C.Cir.1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In other words, if a violation of federal law necessitates a remedy barred by state law, the state law must give way; if no such violation exists, principles of federalism dictate that state law governs. *See, e.g., Perkins*, 47 F.3d at 216; *United States v. Yonkers Bd. of Educ.*, 902 F.2d 213, 219 (2d Cir.1990); *Hoots v. Pennsylvania*, 672 F.2d 1124, 1132 (3d Cir.1982). In this case, then, if the election plan set forth in the consent decree were intended to remedy an admitted or adjudged violation of the Voting Rights Act, the fact that the Board's actions collided with the state statutory scheme just discussed would not stand in the way of the plan's implementation. Notably, however, the consent decree in this case specifically provides that no violation of the Voting Rights Act is to be inferred,[16] and the Supreme Court has specifically held that consent decrees should be construed simply as contracts, without reference to the legislation that motivated the plaintiffs to bring suit. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975); *see also Paralyzed Veterans of Am. v. Washington Metro. Area Transit Auth.*, 894 F.2d 458, 461 (D.C.Cir.1990) (same). Nor is there any other basis for concluding that the consent decree was anything more than a settlement of the NAACP's claims against the county: The fact that the plan received section 5 preclearance from the Attorney General is irrelevant,[17] as is the fact that the district court in *Campbell* might ultimately have concluded that the county's previous election method was in violation of the Voting Rights Act [18]— neither circumstance establishes that a Voting Rights Act violation did indeed exist, and none is to be presumed from the fact of the consent decree's existence. *See, e.g., Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125 (D.C.Cir.1983) ("[T]he long-standing rule is that a district court has power to enter a consent decree without first determining that a statutory violation has occurred.").

Alternatively, of course, the General Assembly of North Carolina could have come to the rescue by enacting a special legislative

---

16. *See CCAGP*, 965 F.Supp. at 77 n. 6 (quoting Stipulation 9 of the consent decree) ("Nothing in this Consent Decree is intended as an adjudication of the lawsuit, nor is the entry of this decree intended in any manner to imply that the county's election system has violated Section 2 of the Voting Rights Act or the Fourteenth Amendment.").

17. Section 5 provides that a covered jurisdiction may not implement any change in a voting "qualification, prerequisite, standard, practice, or procedure" without first obtaining preclearance of that change from the Attorney General or from the District Court for the District of Columbia. 42 U.S.C. § 1973c (1994). A jurisdiction bears the burden of showing that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *Id.* As the Supreme Court has construed it, this section focuses only on whether a proposed change would lead or was intended to lead to a retrogression in the position of minority voters. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, ——, ——, 117 S.Ct. 1491, 1497, 1502, 137 L.Ed.2d 730 (1997). Thus, while consideration of the events leading up to the plan's adoption may be relevant to a section 5 inquiry, *see id.* at ——, 117 S.Ct. at 1503, preclearance neither turns on nor is evidence of a plan's remedial nature.

18. To the extent that *Armstrong v. Adams*, 869 F.2d 410, 414 (8th Cir.1989) (state law limit on authority of county election board vitiated "by the authority of the district court to remedy constitutional violations that may have occurred during the election") may suggest otherwise, we find it unpersuasive.

act authorizing an election plan that would otherwise contravene state law. This would not be an unusual occurrence—indeed, the General Assembly had already done so for the first plan proposed by the Board in 1993, which suggests that this has been a course of action available to the Board throughout this litigation.[19] No such approval, however, was sought or obtained for the plan outlined in the consent decree; without this approval, the Board was without authority under state law to reform its structure and method of election.

In an attempt to diffuse the provisions of the statutory scheme, the Board and the NAACP point to *Moore v. Beaufort County, N.C.,* 936 F.2d 159 (4th Cir.1991), in which, they claim, the Fourth Circuit rejected a state law challenge to a limited voting plan similar to the one presented here. Unfortunately, their reading of *Moore* stretches its holding too far.

Like this case, *Moore* involved the settlement of a case brought pursuant to section 2 of the Voting Rights Act in which the parties agreed that a limited voting plan for Board of County Commissioners elections would be implemented (in that case, in Beaufort County, North Carolina). When the Beaufort County board subsequently rejected the agreement that the attorneys for each side had drafted, the plaintiffs moved to enforce the agreement as written, and the district court granted their motion. After rejecting the county's arguments that no final, binding agreement existed, the Fourth Circuit addressed the county's contention that limited voting was contrary to the "public policy" of North Carolina and held that it was not. *Id.* at 164.

To the extent that *Moore* is relevant at all, it is entirely consonant with our discussion here. We do not hold today that the limited voting scheme provided for in the consent decree is itself contrary to the "public policy" or even the law of North Carolina—indeed, as the *Moore* court noted, it has been successfully implemented in several other jurisdictions in the state.[20] *See id.* Rather, the consent decree fails because state law prevents the Board from unilaterally agreeing to *any* change in its structure or method of election.[21] No such impediment was present in *Moore* because the county's lawyer validated its admission that its previous election method violated section 2 of the Voting Rights Act. *See id.* at 162. In other words, the fact that the plan delineated in the *Moore* consent decree was necessary to remedy a violation of federal law made it unnecessary for the Fourth Circuit to consider the ramifications of state law. By disclaiming any such violation, the Board in this case confined its settling authority to the boundaries of North Carolina law.

## III. CONCLUSION

The Cleveland County Board of Commissioners is, like any other party, free to choose settlement of a suit over the threat of prolonged litigation. But like any other party, it may not do so in a manner that disregards applicable state law. The county's failure to abide by this principle in settling the *Campbell* case renders the consent decree invalid as a matter of law. The district court was thus in error in granting summary judgment in favor of the Board and the NAACP. We therefore reverse the district court and

---

**19.** At oral argument, counsel for the Board was unable to offer a reason why legislative approval of the plan had not been sought. It could be that the Board's hesitancy had something to do with the "representative" nature of the interim appointment provisions of the plan, about which we have serious constitutional doubts.

**20.** It should be noted, however, that of the four jurisdictions cited by the Fourth Circuit in support of its conclusion, three were noncounty entities to which the statutory scheme described above does not apply (the Clinton City Board of Education, the Sampson County Board of Education, and the Town of Benson); the fourth

jurisdiction, Bladen County, had obtained approval of its limited voting scheme by the General Assembly, an action not accomplished in this case. *See Moore,* 936 F.2d at 164.

**21.** As the Board notes, the record reflects the existence of other consent decrees in which North Carolina counties agreed to a change in the structure and election of their Boards of Commissioners in apparent contravention of state law. *See, e.g.,* Joint Appendix at 198 (Vance County). We have no evidence, however, that challenges to these agreements were ever brought.

remand this case with directions to enter summary judgment in favor of the CCAGP and the individual plaintiffs and to vacate the consent decree in its entirety.[22]

Our mandate in this case shall issue in the normal course. We advise the Board and the NAACP, however, that if, prior to that time, they reach an alternative settlement in *Campbell* that adequately addresses the constitutional and state law concerns we raise today, which may involve securing legislative approval, they may petition this court for an early release of the mandate to permit them to return swiftly to the district court with a permissible agreement in hand to seek the court's validation.

*It is so ordered.*

---

**22.** Because we order that the entire consent decree be vacated, we need not address the government's argument that the provisions of the consent decree are severable.